## THOMPSON et al. v. DEAL et al.
### No. 6695.

United States Court of Appeals for the District of Columbia.

Argued April 5, 1937.
Decided June 28, 1937.

---

[1] Senate Documents Nos. 183, 193, 74th Cong., 2nd Sess.

John C. White, of Washington, D. C., and Jerome S. Hafter, of Greenville, Miss., for appellants.

Robert H. Jackson, Asst. Atty. Gen., Leslie C. Garnett, U. S. Atty., and Sewall Key, F. A. LeSourd, and F. J. Neuland, all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

GRONER, J.:

This is an appeal taken from a decree dismissing a bill in equity brought by appellants to recover amounts paid by them in purchasing exemption certificates issued under the Bankhead Act from the National Surplus Cotton Tax Exemption Certificate Pool. Some of appellants reside in Mississippi, others in Alabama. The suit was brought as a class suit in the United States District Court against Deal, the manager of the National Cotton Pool, a resident of the District of Columbia; Wallace, the Secretary of Agriculture; Julian, the Treasurer of the United States; and Payne and Davis, Comptroller and Administrator, respectively, of A. A. A.

The Bankhead Cotton Control Act was passed by Congress "to place the cotton industry on a sound commercial basis, to prevent unfair competition and practices in putting cotton into the channels of interstate and foreign commerce, to provide funds for paying additional benefits under the Agricultural Adjustment Act, and for other purposes."[1] The act was limited to the crop year 1934–35 unless extended by the President. It fixed the quota for the first year at 10,000,000 bales, and authorized the Secretary of Agriculture to determine the total to be produced in a subsequent crop year, and imposed a tax on all cotton produced in excess of the fixed allotment. The Secretary was authorized to allocate to each cotton producing state and county a fixed proportion of the permissible total and likewise to divide up the county total among individual producers of cotton. The tax, equal to $25 a bale, applied to all cotton produced in excess of the amount allotted. No allotment was made to any producer of cotton unless he agreed to comply with the limitations on production prescribed by the Secretary, not only as to cotton but as to all other agricultural commodities. If he did comply, he was furnished with exemption certificates evidencing his right to produce and to gin free of tax the amount of cotton allotted to his farm. The certificates, if not thus used, were transferable or assignable in such manner as the Secretary might prescribe. Violations of the act were made punishable by a fine not exceeding a thousand dollars and imprisonment not exceeding six months, and the act authorized the Secretary to make such rules and regulations as in his opinion were necessary to carry the act into effect, and violations of the Secretary's rules were made punishable by a fine not exceeding $200.

Pursuant to the authorization of the act the Secretary issued regulations under date of March 6, 1935, in which he set up elaborate administrative machinery. So far as material here, the regulations provided for the establishment of surplus cotton tax exemption certificate pools. Broadly speaking, the purpose of these pools was to act as a clearing house for surplus exemption certificates; that is to say, the farmer who had failed to produce an amount of cotton equivalent to his certificates might turn the remainder over to the pool to be sold to a producer who wished to market cotton in excess of his allotment. Each producer surrendering certificates to the pool executed in triplicate a trust agreement appointing the manager of the pool as trustee "to hold all right, title, and interest which the producer may have in said certificates, listed below," and authorizing the manager of the pool "to place said certificates in said pool and give this producer credit for the amount of said certificates as shown below"; that is to say, the manager of the pool was authorized to sell the certificates and after the payment of all expenses to distribute the proceeds "pro rata to the producers who have contributed to the pool." The certificates were to be sold for cash or certified check payable to the pool manager at such price and under such conditions as the Secretary should determine. The price fixed was 4 cents a pound ($20 a bale). Under the provisions of the act and the regulations

---

[1] 48 Stat. 598, amended 48 Stat. 1184, 49 Stat. 776 (7 U.S.C.A. § 701 et seq.).

a producer of cotton whose farm yielded a greater number of pounds than his allotment could market his surplus only by paying a tax of 5 cents a pound on the excess or by buying at four cents a pound certificates covering the amount of such excess.

Appellants allege that during the crop year 1935–36 (the President having extended the provisions of the act) they received their allotments of cotton which might be produced tax exempt, but that they all produced more than the allotted amount. Four courses were then open to them: (a) They could pay the tax of $25 a bale; (b) they could obtain reissued certificates at $20 a bale; (c) they could store their cotton subject to a government lien but not to be thereafter removed without payment of the tax or the purchase of the exemption certificates; or (d) they could ignore the act and be subject to the criminal penalties prescribed therein.

They alleged that they chose the least of the evils and purchased from appellee Deal, manager of the pool, sufficient tax exemption certificates to cover their excess cotton and that they were led to do this because the Secretary had fixed the price of the certificates at one cent less a pound than the tax. They alleged they paid into the pool some $8,500 and that there were in the United States not less than one hundred thousand producers in like situation whose payments into the pool total in excess of three and a half million dollars. They say they made the payments under duress and that the money received by Deal from the sale of certificates, less the deduction of the expenses of the pool, is about to be distributed under the directions of the Secretary of Agriculture to the several persons who surrendered their certificates to the pool.[2] They base their suit upon the invalidity of the Bankhead Act and of the rules and regulations of the Secretary and conclude with the allegation that, if the money is released and paid over to the individual producers, as it is about to be, tracing it would be impossible, and that a suit for recovery under R.S. § 3226, as amended (26 U.S.C.A. §§ 1672–1673), will not lie because the money was not paid to a collector of internal revenue. They ask for the appointment of a receiver to hold the fund and for a preliminary injunction to restrain disposition of it, and pray that upon a final hearing they and those for whom the suit is prosecuted be declared to be the owners of the fund and entitled to receive the amounts which they have severally paid into it.

There was a motion to dismiss which was sustained by the District Court on the ground that the producers who had surrendered to the pool the certificates that appellants bought are the real parties in interest as beneficiaries of the trust fund; that these producers exercised no duress upon appellants; and that the case is controlled by Otis v. Cullum, 92 U.S. 447, 23 L.Ed. 496. We think there is more to the case.

If the Bankhead Act and regulations are invalid, the depositors of the certificates into the pool have no rights which entitle them to the proceeds or to be made parties to the suit. Whatever rights these depositors had arose as a result of the act and of regulations to make it effective. It is only through the power of the act that the surrendered certificates had a value of four cents a pound or any value. If the act and the regulations made by the Secretary are invalid, the farmer who surrendered a certificate had nothing to sell and is entitled to nothing in the distribution of the fund if the fund itself was created by duress. The Bankhead Act was repealed February 10, 1936 (49 Stat. 1106), following the decision in United States v. Butler, 297 U.S. 1, 56 S. C. 312, 80 L.Ed. 477, 102 A.L.R. 914, and we take it as settled for the purposes of this discussion—and indeed it was not otherwise contended in the argument and in the briefs by government counsel—that the decision of the Butler Case invalidating the Agricultural Adjustment Act (48 Stat. 31, 7 U.S.C.A. § 601 et seq.) is controlling and that the act now under consideration and the regulations made pursuant to it are, therefore, invalid. So that the questions, as we think, for decision are: First, is this a suit against the United States? Second, have the appellants a standing in equity? Third, do the allegations of the bill show that this is properly a class suit? Fourth, were the payments made under duress? and Fifth, was duress attributable to the depositors of certificates?

First. Contrary to our previous experience in suits against the Treasurer and other fiscal officers of the United States in

---

[2] Counsel for the government stated in the argument that all but a comparatively small part of the fund had been distributed during the pendency of this proceeding, but that enough had been retained to pay the claims asserted in this suit.

which it is almost invariably insisted that the suit is one against the United States, we are met in this case with the flat-footed statement by the officers sued that this is not a suit against the United States. Thus in paragraph 28 of the return to the rule to show cause filed on behalf of Deal, Wallace, Julian, Payne, and Davis, they say: "Further answering, defendants admit that the amounts paid into said pool through defendant Deal as trustee of said fund were not paid to any Collector of Internal Revenue and were not paid to the United States. Defendants admit that plaintiffs have no remedy for, or right to, the return to the plaintiffs by the United States or by any Collector of Internal Revenue of any part of said payments, and allege that said payments have no connection with and form no basis for any claim against the United States or any agent of the United States in his capacity as such agent, but that said payments were in substance payments between private parties in a matter involving the transfer of property in which the United States Government had and has no proprietary interest."

And in the brief filed on behalf of all the appellees and signed by Mr. Jackson, Assistant Attorney General, it is stated: "This suit has no relationship or similarity to a suit against the government or its officers for the recovery of illegal taxes, penalties, or other levies that have been paid. The suit here is not against the United States, nor it is against a Collector of Internal Revenue who has collected any levies for the United States. The suit is directed against a fund in which the United States has no pecuniary interest whatsoever. A recovery in this proceeding will not be a recovery against the United States, but the effect of it will be a recovery against many individual cotton producers, not parties to this action, who in good faith deposited their property with a trustee for the purpose of sale. Although the appellees who were named as defendants in this action are officers of the United States, the bill makes clear that they are joined only by reason of their relationship to this fund in which the United States has no pecuniary interest. In so far as they handle this fund and in so far as the appellee Deal sold exemption certificates from the pool and deposited the proceeds in the fund, these appellees were representing not the United States but the individual cotton producers who deposited certificates in the pool, and the rights and duties of these appellees are as set forth in the trust agreements upon which the certificates were deposited. That this proceeding is in reality one between individuals who were parties to a purchase and sale transaction, rather than one against the Federal Government or its officers to recover taxes or penalties, is made clear by the appellants themselves in paragraph 28 of their bill."

From these extracts it is obvious that the plaintiffs sued the government defendants in their individual capacities and not as officials of the government in the performance of an official function and that the case has proceeded throughout on this, theory, and we are of opinion that this position is correct. The trustee agreement under which the certificates were deposited required payment to the manager of the pool and stipulated in his behalf that after the payment of expenses he would distribute the fund pro rata to those who were its intended beneficiaries. The case is, therefore, different from Haskins Bros. & Co. v. Morgenthau, 66 App.D.C. 178, 85 F.(2d) 677, for here, as we have seen, the money is entirely a private fund as to which the Treasurer is a mere custodian for private interests and the United States as such are strangers. It is not public money nor money subject to the appropriation of Congress, and therefore it is not money which Congress can dispose of. In this view the principle announced by us in Orinoco Co. v. Orinoco Iron Co., 54 App. D.C. 218, 296 F. 965, 972, and affirmed by the Supreme Court sub nomine Mellon v. Orinoco Iron Co., 266 U.S. 121, 45 S.Ct. 53, 69 L.Ed. 199, is applicable. That was a case arising out of a claim against a foreign nation which by the terms of a protocol had been paid into the United States Treasury as a trust fund for the beneficiaries. A dispute arose as to who was entitled to the fund. One of the claimants presented its claim to the Secretary of State who refused to recognize it or to order it paid out of the fund. Appeal was had to the courts in the District of Columbia, and the jurisdiction of the court was challenged on the ground that the decision of the Secretary of State was final, and it was argued also that the suit was one against the government and could not, therefore, be maintained. As to the last proposition, we said: "The iron company is not seeking in this suit to recover anything from the United States. It is conceded, and properly so, that the money in question is held in the treasury as a trust fund. The government has no claim to it

and it makes none. No matter what the outcome of the suit might be, the government would receive none of the fund. For this reason the suit is not against the United States, as argued by the appellants."

And in the recent case of O'Connor v. Rhodes, 65 App.D.C. 21, 79 F.(2d) 146, 152 (affirmed 297 U.S. 383, 56 S.Ct. 517, 80 L.Ed. 733), the same question arose involving a fund in many respects similar to that in the instant case. In that case there had been a deposit by the Fleet Corporation and by the Alien Property Custodian in a national bank which was secured by a deposit of government bonds and which was paid in full upon the failure of the bank. Suit was brought to recover the excess over the dividend paid to other creditors, and there it was insisted that the suit was against the United States. As to the alien property fund, we said: "The fund is earmarked for a special purpose in the hands of the Attorney General, as the acting Alien Property Custodian, and no interests of the United States would be affected by a decree in the suit. The fact that Congress has authorized the fund to be used for purposes of the Alien Property Custodian's office does not change its character or the rights of the parties."

And so we held it was not a suit against the United States.

■ We think it clear that in this case as in Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570, the suit is not one in which the court is asked to interfere with the official discretion of a government officer. Its entire purpose is to challenge the authority of certain government agents to distribute improperly, as appellants claim, a fund in which they have an interest and in which the government has none—as it is clear, we think, that here the government has no proprietary or possessory rights in the fund. It is also clear that under the authorities we have cited the court may impress an equitable lien on the money and order its return to equitable owners. See Osborn v. Bank of United States, 9 Wheat. 738, 6 L.Ed. 204; German Alliance Ins. Co. v. Van Cleave, 191 Ill. 410, 61 N.E. 94.

■ Second. The bill charges that the officials of the AAA are about to turn over the pool money to the so-called beneficiaries and that in that case it would be impossible to trace it into the hands of the recipients—and in that case appellants would have no recourse either by assumpsit or otherwise. In addition to this, the agreement under which the deposit was made authorized the deduction of expenses for administering the pool. This in itself necessitates an accounting in equity, certainly as the best way of determining for what amount, if anything, the holder of the fund is required to account. These facts, we think, were sufficient to give a court of equity jurisdiction.

■ Third. Nor do we think there is any point in the objection made, but not strongly urged, that this is not properly a class suit. Here each of the appellants and every other person similarly situated has an identical interest in a single fund. Each bears the same relation to the fund, and a disposition of the case as to one will decide the rights of all. Appellants say the suit is not brought to rescind a contract of sale, but to restrain the completion of an unlawful statutory scheme participated in by appellees and by the depositors in the pool agreement to take appellants' money for the benefit of the depositors, and that the suit is brought to enjoin the further dissipation of trust funds belonging to appellants, to prevent appellees from paying such fund to innumerable persons not entitled to it, and thereby placing the fund beyond their reach.

We think the suit is in the nature of an action to impress a fund with a trust and compel its restoration, and we think it is properly brought as a class suit. Here there is an identity of parties and an identity of interests; if one of the appellants can recover, all can recover, and if they do not proceed as a class there must then be a multiplicity of suits. The governing rule is stated in Hartford Life Insurance Co. v. Ibs, 237 U.S. 662–672, 35 S.Ct. 692, 59 L.Ed. 1165, L.R.A.1916A, 765, and Watson v. National Life & Trust Co. (C.C.A.) 162 F. 7.

■ Fourth. The argument on behalf of the government is that appellants were not coerced into doing business with manager Deal. Counsel say that officer could not compel appellants to purchase certificates from the pool, that appellants could just as well have complied with the tax provisions of the act, and in that case would have had recourse against the United States for the recovery of the taxes if the exaction was shown to be invalid. From these facts they draw the conclusion that appellants' purchase of pool certificates was due to their own voluntary desire to avoid payment of the tax and thus to save money. This,

they say, is not duress. Summarized, the argument is that appellants are not seeking the recovery of money wrongfully exacted by the government or by some party acting in behalf of the government who has exerted compulsion upon them, but are seeking to recover money paid to entirely innocent third parties who gave to appellants in return for their money property rightfully belonging to those third parties. But we think this contention cannot be sustained. The government had no right to limit the production of cotton or to use the taxing power exclusively to accomplish that end. We are not saying that a tax on the processing of cotton is objectionable; but the Bankhead Act did not impose a true tax and was not designed to raise revenue. It was—as it was intended to be—only a coercive measure supplemental to the Agricultural Adjustment Act (7 U.S.C.A. § 601 et seq.).

The duress situation which the Supreme Court found to exist in the act challenged in United States v. Butler is as apparent here as there. And as to the provisions of the act there the court said: "The farmer, of course, may refuse to comply, but the price of such refusal is the loss of benefits. The amount offered is intended to be sufficient to exert pressure on him to agree to the proposed regulation. The power to confer or withhold unlimited benefits is the power to coerce or destroy. If the cotton grower elects not to accept the benefits, he will receive less for his crops; those who receive payments will be able to undersell him. The result may well be financial ruin. The coercive purpose and intent of the statute is not obscured by the fact that it has not been perfectly successful. It is pointed out that, because there still remained a minority whom the rental and benefit payments were insufficient to induce to surrender their independence of action, the Congress has gone further, and, in the Bankhead Cotton Act, used the taxing power in a more directly minatory fashion to compel submission. This progression only serves more fully to expose the coercive purpose of the so-called tax imposed by the present act. * * * This is coercion by economic pressure. The asserted power of choice is illusory."

Here the plan, as we have shown, was to control the amount of production. At 10 cents a pound, which until the recent advance was considered a fair return to the farmer, the tax imposed by the act was equal to 50 per cent. of the value of the cotton produced. This was itself confiscatory. No farmer, therefore, was in position to refuse to sign the agreement which the act required and to accept his allotment as the Secretary made it. Having accepted the allotment and by good husbandry and diligence, or by the fertility of his land, grown and harvested a crop in excess of the allotment, he was faced with the alternative of paying to the government in the form of a tax half the value above the allotment, or purchasing certificates at a sacrifice of two-fifths. Failing one or the other of these courses, he could not sell his cotton without subjecting himself to the penalty of fine and imprisonment.

Whatever may have been the old rule as to the characteristics of duress and coercion, a more liberal view prevails, and ought to prevail, today,—a change of viewpoint which has arisen as government has extended its control over the domestic concerns of the citizen. The Supreme Court of Wisconsin[3] has expressed this better view as follows: "The old rule that there could be duress only where there was a threat of loss of life, limb, or liberty has been so changed that duress may sometimes be implied when a payment is made or an act performed to prevent great property loss or heavy penalties when there seems no adequate remedy except to submit to an unjust or illegal demand and then seek redress in the courts."

We are not unmindful of the rule that ordinarily when money has been voluntarily paid with full knowledge of the facts it cannot be recovered on the ground the payment was made under a misapprehension of the legal rights and obligations of the person paying. But we think this rule has no present relevancy for, as Mr. Justice Clifford said in United States v. Ellsworth, 101 U.S. 170, 174, 25 L.Ed. 862, in a very clear case of what many courts would have called a voluntary payment made under misapprehension of legal rights: "Call it mistake of law or mistake of fact, the principles of equity forbid the United States to withhold the same from the rightful owner."

We might prolong this discussion indefinitely, for the books are full of cases on the subject, but this would avail us nothing since, as we think, the question we have

[3] Minneapolis, St. P. & S. S. M. Ry. Co. v. Railroad Commission, 183 Wis. 47, 197 N.W. 352, 355.

asked is answered in principle by the Supreme Court in Union Pacific R. Co. v. Public Service Commission, 248 U.S. 67, 39 S. Ct. 24, 25, 63 L.Ed. 131. That was a case concerning the validity of a charge made by the Public Service Commission of Missouri for a certificate authorizing the issue of bonds secured by a mortgage on the lines of the Union Pacific Railroad. There was a state statute against the issue of such bonds without the authority of the commission and the imposition of penalties, and the bonds were unmarketable without the certificate. The railroad applied to the commission for the certificate, and the commission granted it and charged a fee of ten thousand odd dollars. The railroad protested on the ground that the exaction was an interference with interstate commerce. The railroad appealed to the courts for the recovery of the fee, but was denied relief in the Supreme Court of Missouri. The case went to the Supreme Court of the United States, which held the tax to be an interference with interstate commerce, and on the question whether it was recoverable notwithstanding the application was voluntary, as the state court held, Mr. Justice Holmes speaking for the court, said that this was a question of fact which the Supreme Court was authorized to examine for itself and "On the facts we can have no doubt that the application for a certificate and the acceptance of it were made under duress. The certificate was a commercial necessity for the issue of the bonds. The statutes, if applicable, purported to invalidate the bonds and threatened grave penalties if the certificate was not obtained. The Railroad Company and its officials were not bound to take the risk of these threats being verified. Of course, it was for the interest of the Company to get the certificate. It always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called. The Eliza Lines, 199 U.S. 119, 130, 131, 26 S.Ct. 8, 50 L.Ed. 115, 4 Ann.Cas. 406. If, as may be, the Supreme Court of the State regards or will regard this statute as inapplicable, Public Service Commission v. Union Pacific R. R. Co., 271 Mo. 258, 197 S.W. 39, probably the State would not wish to retain the charge, but we repeat, the Railroad Company was not bound to take the risk of the decision, and no proceeding has been pointed out to us by which it adequately could have avoided evils that made it practically impossible not to comply with the terms of the law. Atchison, Topeka, & Santa Fe Ry. Co. v. O'Connor, 223 U.S. 280, 286, 32 S.Ct. 216, 56 L. Ed. 436, Ann.Cas.1913C, 1050."

We think it is manifest from what is said in the case just cited that the question of whether a payment is voluntary or involuntary has been in large measure relieved of the artificial tests formerly applied by some courts. Here the payment was made under such an urgent necessity as to imply that it was made under compulsion; and this brings us to the final question in the case; namely, whether in order to recover appellants must show that the compulsion or coercion came from the parties who had deposited certificates in the pool.

■ Fifth. It is insisted by appellees that there can be no recovery because the depositors in the pool were not the persons who exerted the duress or committed the acts which compelled the payment, and Chesebrough v. United States, 192 U.S. 253, 24 S.Ct. 262, 48 L.Ed. 432, and United States v. New York & Cuba M. S. S. Co., 200 U.S. 488, 26 S.Ct. 327, 50 L.Ed. 569, are cited to sustain the proposition. We have given due consideration to the rule laid down in those cases, but we think it has no application here. To the contrary, we think there are proper grounds on which the right of recovery can be sustained:

Appellee Deal occupied a dual relationship. He was an agent of the government, and in the eyes of appellants he was the government, and he was also trustee of the depositors in the pool. He was appointed by the Secretary of Agriculture pursuant to authority vested in him by Congress, and by like authority, plus the consent of the depositors, he became the agent of the latter. He received their certificates pursuant to an agreement to sell them in accordance with the provisions of the law and to account to them for the proceeds. In this view it cannot be contended, we think, that in applying the compulsion of an invalid law, of which the depositors were to be the beneficiaries, he was not in fact their agent. On the other hand, as the agent of the government he was an instrumentality of the taxing statute. In short, he was an inseparable part of a common purpose, the purpose itself being unlawfully to provide benefits and bonuses to cotton farmers. It would be manifestly incorrect to say that the act did not compel the purchase of certificates, for both purchase and sale were immediate-

ly necessary to all concerned—necessary to the purchasing farmer in order that he might realize more or suffer less on account of his industry, necessary to the government in order that its plan of benefits and gratuities might be consummated, and necessary to the depositor in order that he might obtain the benefits.

In the situation we have here Deal was at once the representative of the coercive force by which payment was compelled and the representative of those who were the intended beneficiaries of the payments. In such a case the compulsion was as much the act of the depositor as if there had been no intervention of a third party. Granted the duress, the depositor acting through the pool which made it effective ought not to escape the consequences on the ground that not he but his agent applied the compulsion.

It is an ancient maxim of the law that what is forbidden to a person to do himself he cannot do by the agency of another. And so it has always been held that an agent who receives money for his principal is liable so long as he stands in his original situation and until there has been a change of circumstances by his having paid over the money to the principal. This rule was recognized in Elliott v. Swartwout, 10 Pet. 137, 9 L.Ed. 373, where it is said that it is settled law that, if money is illegally demanded and received by an agent, he cannot exonerate himself from personal responsibility by paying it over to his principal when he has notice not to pay it over. Here the depositors in the pool were in a wholly different position from that of the bank in Otis v. Cullum. They actively participated in the plan sought to be carried through by the provisions of the Bankhead Act. They agreed to be bound by its terms. They obtained their certificates by virtue of its provisions, and they turned them over to the pool to be sold for their benefit, equally by virtue of its provisions; and, when payment for them was exacted by coercion, the law implied a promise to make restitution and both the agent and the principal are liable on that promise. And so when Deal, acting under an invalid law, coerced payment for the certificates, we think it is well settled that a suit may be sustained against him to recover back money which he has in his possession and to which his principal has no legal claim.

The situation here is not wholly unlike that in Osborn v. Bank of United States, supra. There the question was whether the court ought to make a decree against the officers of Ohio who had the money taken from the bank; that is to say, whether they were to be considered as having a real interest or as being merely nominal parties. The Supreme Court had already decided that the bank had a constitutional and legal existence and enjoyed exemption from taxation. In that view the taking by the state officers of the property and money of the bank was without justification. The decision was that the taking did not change the title and that the court might arrest the money before it was put out of their possession and restore it to the rightful owner.

Analogous cases are of frequent occurrence. A sheriff sometimes makes a seizure with process from a court without jurisdiction, or when the judgment is rendered without citation. A collector of customs charges duties upon merchandise on the free list, or imposes an excessive duty. A court appoints an administrator upon erroneous information as to the death of the supposed decedent. These officers are in each case personally liable at law, without reference to the persons interested in the orders or who had procured them. A person interested as owner in each case, when there are facts of mischief and injury, may resort to equity.

Here the fund is admittedly under the control of appellees, admittedly also they are about to distribute it under the provisions of the pool agreement to persons who legally have no valid claim to it. To say in such circumstances that their action may not be arrested and the money restored to those from whom it has been illegally exacted is to admit a wrong without a remedy and this, we think, is not the case.

Reversed and remanded.

STEPHENS, Associate Justice.

I dissent. Assuming the correctness of the ruling of the majority that the suit is properly brought in equity and is properly a class suit, still I think there can be no recovery by the appellants for the following reasons:

1. The suit, in my opinion, is against the United States, and the United States not having consented to be sued, it must for that reason fail. Against whom a suit is brought "is to be determined, not by the fact of the party named as defendant on the record, but by the result of the judgment or decree which may be entered . . ." in the case. Minnesota v. Hitchcock, 185 U.S. 373, 387, 22 S.Ct. 650, 46 L.Ed. 954. The

result of the decree which will be entered if the appellants prevail in the instant case will be to compel the payment to the appellants by the Treasurer of the United States of moneys now in his custody in the United States Treasury, moneys which reached his custody by virtue of an act of Congress and regulations promulgated thereunder having the force of law, moneys which under such act and regulations are to be disbursed to those who deposited certificates in the pool.

I am unable to agree with the distinctions taken by the majority in respect of Haskins Bros. & Co. v. Morgenthau, 66 App.D.C. 178, 85 F.(2d) 677, certiorari denied 299 U. S. 588, 57 S.Ct. 118, 81 L.Ed. 433. On the contrary, I think that case clearly determines that a suit brought against the Treasurer of the United States to compel him to pay out money in the United States Treasury in a manner contrary to that directed by Congress is a suit against the United States. In the Haskins Case the appellants sought to recover moneys paid under an allegedly unconstitutional revenue act applicable to the first domestic processing of Philippine coconut oil. There the suit was against the Secretary of the Treasury, the Treasurer and the Comptroller General of the United States. The moneys in question had reached the hands of the Secretary of the Treasury and the Treasurer as a result of the act of Congress, and as a further result of the act had been earmarked in a separate fund for the benefit of, and to be paid over to, the Philippine Islands. The United States claimed no interest in the fund, except upon a contingency which had not arisen. We held in the Haskins Case that the suit must fail. We said:

"First. We think the suit is in effect one against the United States. It is brought against the Secretary of the Treasury, the Treasurer, and the Comptroller General in their official capacities. It seeks to compel the payment of money now deposited in the United States Treasury. In this view the United States are necessary parties and, since they have not consented to be sued, the suit against the officers of the United States cannot be maintained. *We know of no power in this or any other court to compel the Secretary of the Treasury or the Treasurer of the United States, in a suit brought against them in their official capacities, to pay out money in the treasury in a manner contrary to that directed by Congress.* We hold these general principles to be axiomatic:

"First, that an act of Congress is necessary for the withdrawal of money from the public treasury;

"Second, that no suit can be brought to enforce the making of an appropriation;

"Third, that the Secretary of the Treasury and the Treasurer are officers of the United States holding offices established by law; that their duties are to receive and preserve the public money and not to disburse it except conformably to law; that as officers of the United States they have no right or estate in the public money or any other money in the treasury, whether earmarked as a special fund or as part of the general fund of the United States; that they are in effect mandataries of a limited and defined commission;

"Fourth, that where an obligation is cast upon a principal and not upon his agent, a court cannot enforce it against the agent as long as he is acting wholly as agent.

"In the instant case *it is therefore of no consequence whether the act under which the tax was collected be constitutional or unconstitutional. The fact that the tax has been collected and deposited in the treasury by the collecting officials of the government renders the custodian of the fund impotent to withdraw the money and disburse it unless and until directed to do so by an act of Congress or until the United States shall submit to be sued to determine its disposition.*

"*It is equally of no consequence that the bill alleges that the fund belongs to appellant and others similarly situated.* It is not in the hands of the officers but in the treasury, and though earmarked as a special or trust fund, has been mingled with the moneys of the United States. The purpose of the bill, therefore, is to coerce the United States, through their officers, to pay out money in the treasury as to which Congress has limited the power of withdrawal to the payment to the Philippine government. To permit this, would be to usurp the legislative function of appropriation, to substitute a court for the executive officers of the government, and to supplant by an order of court the duty and obligations imposed upon them by their oaths of office. *It is therefore of no moment whether the United States have the use of this money as they do the ordinary revenues of the government or whether the money represents a trust fund created by Congress and earmarked for a specific purpose. In either case it is money in the Treasury of the United States as to*

*which the United States had and have the power of control and disposition.*

"*It is incorrect, therefore, to say that the authority and duty of the United States depend alone upon their pecuniary interest.*" [Italics supplied] 66 App.D.C. 178, 85 F.(2d) 677, at pages 680–681.

The instant case is, I think, on all fours with the Haskins Case. Just as in the Haskins Case the moneys reached the custody of the Secretary of the Treasury and the Treasurer as a result of an act of Congress, so in the instant case the proceeds of the pool are in the custody of the Treasurer as the result of an act of Congress and of regulations having the effect of law promulgated thereunder. Just as in the Haskins Case the fund was earmarked to be paid over to the Philippine Islands, so in the instant case it is earmarked to be paid over to the depositors in the pool. Just as in the Haskins Case the United States had no interest in the fund, so they have none here. Just as in the Haskins Case the moneys were to be paid to the Philippines by virtue of an act of Congress, so in the instant case the fund was to be paid to the depositors in the pool as a result of the Bankhead Act and the regulations promulgated thereunder. Just as in the Haskins Case the appellants asserted a right to recover the moneys because of the unconstitutionality of the revenue act, so in the instant case the claim of the appellants is based upon the asserted unconstitutionality of the Bankhead Act. As we ruled there, so I think we must rule here, that: "We know of no power in this or any other court to compel the Secretary of the Treasury or the Treasurer of the United States [in the instant case the Treasurer, the Secretary of Agriculture and the pool manager], in a suit brought against them in their official capacities, to pay out money in the treasury in a manner contrary to that directed by Congress."

I cannot agree that Mellon v. Orinoco Iron Co., 266 U.S. 121, 45 S.Ct. 53, 69 L.Ed. 199, and Houston v. Ormes, 252 U.S. 469, 40 S.Ct. 369, 64 L.Ed. 667,[1] are contrary to the views I express. The real basis of the holding of those cases is not, as I read them, that because the United States claim no interest in a fund which is in the United States Treasury, the Treasurer may be compelled by a court to pay it out in a manner contrary to that directed by Congress. If that were the real basis of those cases, then the Has-

kins Case should be overruled. In Mellon v. Orinoco Iron Co. and Houston v. Ormes funds in the possession of the Secretary of the Treasury and the Treasurer of the United States were, by virtue of an Act of Congress, to be paid to certain persons. In the Orinoco Case the fund had been furnished by Venezuela; in the other, by Congress; in both cases the United States claimed no interest in the fund. The suits were in equity to subject the fund, as against the person designated by the act to receive it, to an equitable claim, and the essential theory under which the Supreme Court of the United States allowed recovery is, as I understand the decisions, that the payment of a fund to the person designated by an act of Congress to receive it is a ministerial duty the performance of which can be compelled by mandamus, and that from this it is a necessary corollary that one who has an equitable right in the fund, as against the person designated, may have relief against the Treasury through a mandatory writ of injunction or receivership, making the person designated a party so as to bind that person, and so that the decree may afford a proper acquittance to the Government. It is too well settled to require the citation of authority that a suit to compel an officer of the United States to perform a ministerial duty is not a suit against the United States requiring their consent to be sued. As I understand the two cases they do no more than recognize that a public officer may be compelled to an equitable, as well as to a strictly legal, performance of a ministerial duty. In the two cases in question the claim asserted was one asserted through the right of the person designated in the act to receive the money; in the instant case the claim of appellants is asserted in derogation of the right of those designated in the act and regulations to receive the money.

I am further not able to agree with the view of the majority that the suit is not a suit against the United States because the appellees admit in their return to the rule to show cause that the amounts paid into the pool through the appellee Deal as trustee of the fund were not paid to any collector of internal revenue and were not paid to the United States. At this point in the return factual differentiation of the payments from taxes as such was being made, and it was thus being denied that the amounts paid into the pool constituted exactions, and being asserted that they were not

---

[1] Not cited in the majority opinion.

being paid to any collector of internal revenue or to the United States, *i. e.*, as taxes. If the contents of the return were intended to mean that the moneys in question have not been paid to the Treasurer and are not now in the Treasury of the United States, then I think they must be disregarded because the case is before us on motion to dismiss the petition of the appellants and this motion admits the well pleaded allegations of the petition, and in paragraph 22 of the petition it is alleged that the manager of the pool, to whom the moneys in question in the suit were paid by the appellants and other producers of cotton in like situation, "has deposited same with the defendant Treasurer under a special symbol number, . . ." I think also that the admissions of counsel for the appellees in their brief that the suit is not one against the United States cannot bind the court. Whether a suit is or is not one against the United States is a jurisdictional question, and if it is such a suit here, then the United States have not consented to be sued and there is an absence of necessary parties without the presence of which the court has no power to proceed. In paragraph 4 of the petition it is stated that the defendant [appellee] Julian "is the Treasurer of the United States, and is sued individually *and in his capacity as such Treasurer.*" [Italics supplied] The prayer of the petition seeks "a direction to the defendants or to the receiver of this court to pay over to plaintiffs. . . ." In view of this and of the admission by the motion to dismiss of the assertion that the moneys are deposited with the Treasurer I see no escape, under the Haskins Case, from the conclusion that the instant suit is one against the United States. It is of interest to note that in their motion to dismiss the petition, appellees asserted, among other grounds of the motion, that the suit as against the Treasurer, the Secretary of Agriculture, the Comptroller of the Agricultural Adjustment Administration, and the Administrator of the Agricultural Adjustment Administration "is essentially one against the United States, which may not be sued without its consent, and has not consented to be sued herein."

2. Even if the view of the majority that the suit is not one against the United States be taken as correct, still I think the appellants cannot recover. If the suit *is not one* against the United States, then it must be one against the depositors, through their agents, for the ultimate effect of the decree will be to withhold from the depositors the moneys in question and pay them over to the appellants. The suit is founded upon duress. On the topic of duress I understand the majority to reason thus: Under United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, and Union Pacific R. R. Co. v. Public Service Comm. of Missouri, 248 U.S. 67, 39 S.Ct. 24, 63 L.Ed. 131, the Bankhead Act and the regulations promulgated thereunder constitute an unconstitutional legislative plan of economic coercion to control agricultural production; the purchase of· certificates from the pool by the appellants was involuntary, compelled as the choice of the least of several evils. The duress thus found by the majority is clearly, in my view, a duress imposed by the Government, not by the depositors of certificates in the pool. This was the theory of the appellants in their petition, and in their briefs. In paragraph 26 of the petition they state that "in paying their money into said Pool they did so because of the coercion and duress imposed upon them by the said Bankhead Act, the said regulations issued thereunder and actions of said defendants taken in pursuance thereof. . . ." The reference to the defendants [appellees] is I think obviously a reference to the defendants as officers of the United States acting as such in pursuance of the Bankhead Act and the regulations. In their brief appellants say: "The compulsion flowed from the Bankhead Act and from the regulations promulgated by the Secretary of Agriculture under the authority of the act, which were a part of the act itself. The Pools were creatures of the regulations, and being such, were creatures of the act. They were, in legal effect, created by the act and were a part of the machinery of the act. The Bankhead Act, the regulations of the Secretary of Agriculture under the act, and the Pools created by the regulations were all part of one and the same plan. The compulsion flowed from the Act and the agencies created under the Act." The appellants' petition, as I read it, does not charge that the duress was imposed by the depositors of the certificates, or by their agents acting in private capacity, nor does it charge as I read it, that the depositors, or their agents acting in private capacity, were participators in the duress of the statute and the regulations, or sharers in any unconscionable sense, as compared with the appellants, in the fruits of the duress. On the contrary I think it appears, under the facts as pleaded in the petition, that those who deposited certificates in the

pool were as much the subject of the economic pressures of the Bankhead Act—as the Act and its pressures are characterized in United States v. Butler, supra—as were those who purchased certificates from the pool. Section 6 of the Bankhead Act provided that no certificate of exemption should be issued and no allotment made to any producer unless he agreed to comply with the conditions and limitations on production prescribed by the Secretary of Agriculture.[2] Both the depositors of the certificates in the pool and the purchasers of certificates from the pool were seeking to realize, out of the legal-economic situation held in United States v. Butler, supra, to. have been created by the Agricultural Adjustment Act and the Bankhead Act, on what they possessed. The certificate depositors were seeking to realize on certificates, for which they had no cotton; the certificate purchasers were seeking to realize on cotton, for which they had no certificates. Neither were, in any realistic sense, parties· to the duress. The depositors of the certificates had as much or as little knowledge of the unconstitutionality of the Act as the purchasers. The theory of the Supreme Court in the Butler Case is, I think, that of a duress directed at all cotton producers, and hence as much at those who deposited certificates in the pool as at the ones who purchased certificates from the pool.[3]

The appellants themselves apparently recognize that the suit, to be well founded, must be against those who imposed the duress found in United States v. Butler, supra, to have been imposed, for they say in their brief, after asserting the unconstitutionality of the Bankhead Act under the Butler Case: "It therefore follows that if the penalties paid by appellants were made under duress and that such duress *flowed from the one from whom recovery is sought,* such penalties can be recovered." [Italics supplied] For this they cite Union Pacific R. R. Co. v. Public Service Comm. of Missouri, supra, wherein the duress was that of the statute of Missouri and of the Public Service Commission of Missouri acting un-

[2] In terms Section 6 provided:

"A producer of cotton desiring to secure a tax-exemption certificate may file an application therefor with the agent designated by the Secretary of Agriculture, accompanied by a statement under oath showing the· approximate quantity of cotton produced on the lands presently owned, rented, share-cropped, or controlled by the applicant during a representative period fixed by the Secretary of Agriculture, and also the number of acres of land in said lands in actual cultivation for the three preceding years, and the quantity of cotton, in the best judgment of the applicant, said lands would have produced if all the cultivated land h'ad been planted to cotton. Said application shall state any other facts which may be required by the Secretary of Agriculture. No certificate of exemption shall be issued and no allotment shall be made to any producer unless he agrees to comply . with such conditions and limitations on the production of agricultural commodities by him as the Secretary of Agriculture may, from time to time, prescribe to assure the cooperation of such producer in the reduction programs of the Agricultural Adjustment Administration and to prevent expansion on lands leased by the Government of competitive production by such producer of agricultural commodities other than cotton and the allotment of and certificates of exemption issued to any producer shall be subject to revocation on violation by him of such conditions and limitations, and no crim-

inal penalties shall apply to the violation of this provision." 48 Stat. 601 (7 U.S. C.A. § 706).

[3] See United States v. Butler, 297 U. S. 1, 70–71, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914:

"The regulation is not in fact voluntary. The farmer, of course, may refuse to comply, but the price of such refusal is the loss of benefits. The amount offered is intended to be sufficient to exert pressure on him to agree to the proposed regulation. The power to confer or withhold unlimited benefits is the power to coerce or destroy. If the cotton grower elects not to accept the benefits, he will receive less for his crops; those who receive payments will be able to undersell him. The result may well be financial ruin. The coercive purpose and intent of the statute is not obscured by the fact that it has not been· perfectly successful. It is pointed out that, because there still remained a minority whom the rental and benefit payments were insufficient to induce to surrender their independence of action, the Congress has gone further and, in the Bankhead Cotton Act, used the taxing power in a more directly minatory fashion to compel submission. This progression only serves more fully to expose the coercive purpose of the so-called tax imposed by the present act. It is clear that the Department of Agriculture has properly described the plan as one to keep a non-cooperating minority in line. This is coercion by economic pressure. The asserted power of choice is illusory."

der the statute, and wherein the recovery was had against the latter—there being apparently no impediment in Missouri to the suit against the State through its agency, the Commission. If the depositors of certificates did not impose the duress, and did not participate in its imposition, then the only basis upon which recovery against them could be allowed would be that they shared in the fruits of the duress in such manner as to make it unconscionable for them to prevail, as against the appellants. And in respect of this, if my analysis above set forth is correct—that they were as much the subject of the economic pressures as the appellants—then the equitable situation of the depositors and the purchasers is the same. In such a situation those having the prior legal right should, under familiar doctrines of equity, prevail. And if this suit is against the depositors, or their agents in private capacity, then the legal right is in them because the moneys are in their possession—that is, the possession of the agents in private capacity.

Characterizing in somewhat more general terms what seem to me to be the essential errors in the views of the majority: On the facts, in reasoning to the infliction of a substantive wrong upon the appellants, the majority have, I think, looked upon the wrong as one inflicted by the Government, but in reasoning to the existence of a remedy, the majority seem to me to have looked upon the wrong as one which the depositors inflicted or participated in inflicting, or as one of which the depositors in some inequitable manner received the fruits. And on the law I think that the majority have carried beyond its proper application the maxim "equity will not suffer a wrong to be without a remedy." It is so well settled as not to require the citation of more than general authority that "the maxims, that 'every right has a remedy,' and that 'where the law does not give redress equity will afford relief,' however just in theory, are subordinate to positive institutions, and cannot be applied either to subvert established rules of law, or to give the courts a jurisdiction hitherto unknown." 10 R.C.L., Equity, § 129, p. 379. And the maxim "equity will not suffer a wrong to be without a remedy" is not safely to be followed in respect of a wrong asserted to have been imposed by the Government. The United States have consented, by virtue of Rev.Stat. §§ 3220, 3226, as amended (26 U.S.C.A. §§ 1670, 1672–1673, 1676), to submit to suits for the refund of taxes errone-

ously collected, but they have not consented, by any statute to which we are referred or of which I am aware, to submit to suits for the refund of moneys paid for such certificates as are involved in the instant case. The majority reason that: a substantive wrong was inflicted upon the appellants through the economic pressures of the Bankhead Act; had the appellants chosen to pay the tax imposed by the Act instead of purchasing certificates, they could have recovered the tax under the statute referred to; payment for the certificates was in the nature of a penalty; therefore, by a parity of reasoning, and under the maxim "equity will not suffer a wrong to be without a remedy" the appellants may recover the payments for certificates.

Conceivably if under the Bankhead Act the Government inflicted a wrong, it should have created a remedy, by submitting itself to suit in respect of certificate payments, as it has concerning erroneous collection of taxes. But to create such a remedy is for the Congress, not for the courts; and the sin of omission of the Congress, if there be such, ought not be visited upon the depositors of certificates. The Congress not having seen fit to provide a remedy in respect of certificate payments, I think the courts should, as between the depositors of certificates and the appellant purchasers thereof, both of which groups were in my view equally subject to the asserted duress and equally innocent thereof, leave the loss where it has fallen and the moneys where they are.