THOMPSON et al. (ROBINSON et al., Intervenors), v. DEAL et al.

No. 60557.

District Court of the United States for the District of Columbia.

March 24, 1943.

John C. White, of Washington, D. C., and Jerome S. Hafter, of Greenville, Miss., for plaintiffs.

George E. H. Goodner and Scott P. Crampton, both of Washington, D. C., for intervenors.

Samuel O. Clark, Jr., Asst. Atty. Gen. and Andrew D. Sharpe, John G. Remey, and John E. Garvey, Sp. Assts. to the Atty. Gen., and Edward M. Curran, U. S. Atty., of Washington, D. C., for defendants.

LETTS, Justice.

The nature of this case was fully considered by the Court of Appeals for the District of Columbia and the case as made by the plaintiffs is analyzed in the opinion of that court in the case of Thompson et al., v. Deal, et al., 67 App.D.C. 327, 92 F.2d 478. It is there stated that this is an action brought to recover amounts paid in purchasing exemption certificates issued under the Bankhead Act from the National Surplus Cotton Tax Exemption Certificate Pool. The suit was brought as a class suit against Deal, the manager

of the National Cotton Pool; Wallace, the Secretary of Agriculture; Julian, the Treasurer of the United States; and Payne and Davis, Comptroller and Administrator, respectively, of A.A.A.

The Bankhead Act was passed by Congress "to place the cotton industry on a sound commercial basis, to prevent unfair competition and practices in putting cotton into the channels of interstate and foreign commerce, to provide funds for paying additional benefits under the Agricultural Adjustment Act, and for other purposes." 48 Stat. 598, 7 U.S.C.A. § 701 et seq. The Act was limited to the crop year 1934-35 unless extended by the President. It fixed the quota for the first year at 10,000,000 bales, and authorized the Secretary of Agriculture to determine the total to be produced in a subsequent crop year, and imposed a tax on all cotton produced in excess of the fixed allotment. The Secretary was authorized to allocate to each cotton producing state and county a fixed proportion of the permissible total and likewise to divide up the county total among individual producers of cotton. The tax, equal to $25 a bale, applied to all cotton produced in excess of the amount allotted. No allotment was made to any producer of cotton unless he agreed to comply with the limitations on production prescribed by the Secretary, not only as to cotton but as to all other agricultural commodities. If he did comply, he was furnished with exemption certificates evidencing his right to produce and to gin free of tax the amount of cotton allotted to his farm. The certificates, if not thus used, were transferable or assignable in such manner as the Secretary might prescribe. Violations of the Act were made punishable by a fine not exceeding a thousand dollars and imprisonment not exceeding six months, and the Act authorized the Secretary to make such rules and regulations as in his opinion were necessary to carry the Act into effect, and violations of the Secretary's rules were made punishable by a fine not exceeding $200.

Pursuant to the authorization of the Act the Secretary issued regulations under date of March 6, 1935, in which he set up elaborate administrative machinery. So far as material here, the regulations provided for the establishment of surplus cotton tax exemption certificate pools. Broadly speaking, the purpose of these

pools was to act as a clearing house for surplus exemption certificates, that is to say, the farmer who had failed to produce an amount of cotton equivalent to his certificates might turn the remainder over to the pool to be sold to a producer who wished to market cotton in excess of his allotment. Each producer surrendering certificates to the pool executed in triplicate a trust agreement appointing the manager of the pool as trustee "to hold all right, title, and interest which the producer may have in said certificates, listed below," and authorizing the manager of the pool "to place said certificates in said pool and give this producer credit for the amount of said certificates as shown below," that is to say, the manager of the pool was authorized to sell the certificates and after the payment of all expenses to distribute the proceeds "pro rata to the producers who have contributed to the pool." The certificates were to be sold for cash or certified check payable to the pool manager at such price and under such conditions as the Secretary should determine. The price fixed was four cents a pound ($20 a bale). Under the provisions of the Act and the regulations a producer of cotton whose farm yielded a greater number of pounds than his allotment could market his surplus only by paying a tax of five cents a pound on the excess or by buying at four cents a pound certificates covering the amount of such excess.

Plaintiffs allege that during the crop year 1935-36 (the President having extended the provisions of the Act) they received their allotments of cotton which might be produced tax exempt, but that they all produced more than the allotted amount. Four courses were then open to them: (a) they could pay the tax of $25 a bale; (b) they could obtain reissued certificates at $20 a bale; (c) they could store their cotton subject to a government lien but not to be thereafter removed without payment of the tax or the purchase of the exemption certificates; or (d) they could ignore the Act and be subject to the criminal penalties prescribed therein.

They alleged that they chose the least of the evils and purchased from defendant Deal, manager of the pool, sufficient tax exemption certificates to cover their excess cotton and that they were led to do this because the Secretary had fixed the price of the certificates at one cent less a pound than the tax. They alleged they paid into the pool some $8,500 and that there were in the United States not less than one hundred thousand producers in like situation whose payments into the pool total in excess of three and a half million dollars. They say they made the payments under duress and that the money received by Deal from the sale of certificates, less the deduction of the expenses of the pool, is about to be distributed under the directions of the Secretary of Agriculture to several persons who surrendered their certificates to the pool. They base their suit upon the invalidity of the Bankhead Act and of the rules and regulations of the Secretary and conclude with the allegation that if the money is released and paid over to the individual producers, as it is about to be, tracing it would be impossible, and that a suit for recovery under R.S. § 3226, as amended by Revenue Act 1936, § 807(a), 26 U.S. C.A. Int.Rev.Acts, page 653, will not lie because the money was not paid to a collector of internal revenue. They ask for the appointment of a receiver to hold the fund and for an injunction to restrain disposition of it, and pray that upon a final hearing they and those for whom the suit is prosecuted be declared to be the owners of the fund and entitled to receive the amounts which they have severally paid into it. Such statement of the case with a few minor changes is in the language of the Court of Appeals.

■ The Bankhead Act was repealed February 10, 1936, 49 Stat. 1106, following the decision in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914. The decision of the Butler case invalidating the Agricultural Adjustment Act, 7 U.S.C.A. § 601 et seq., is controlling. The Act and the regulations made pursuant to it are therefore invalid. The Court of Appeals held that this suit is in the nature of an action to impress a fund with a trust and compel its restoration. In the opinion the court said of this suit [67 App.D.C. 327, 92 F.2d 482], " * * * it is obvious that the plaintiffs sued the government defendants in their individual capacities and not as officials of the government in the performance of an official function." The court further said, " * * * the case is, therefore, different from Haskins v. Morganthau, 66 App.D.C. 178, 85 F.2d 677, for here, as we have

seen, the money is entirely a private fund as to which the Treasurer is a mere custodian for private interests and the United States as such are strangers. It is not public money nor money subject to the appropriation of Congress, and therefore it is not money which Congress can dispose of. In this view the principle announced by us in Orinoco Co. v. Orinoco Iron Company, 54 App.D.C. 218, 296 F. 965, 972, and affirmed by the Supreme Court sub nomine Mellon v. Orinoco Iron Co., 266 U.S. 121, 45 S.Ct. 53, 69 L.Ed. 199, is applicable." In that case the Court of Appeals found that it was conceded that the money in question was held in the Treasury as a trust fund and for that reason the suit was not against the United States.

In the instant case the evidence discloses that there is no fund in the hands of the defendants nor held in the Treasury, over which the defendants as individuals have any control whatever. The evidence clearly shows that all checks and bank drafts received in payment for tax exemption certificates were by appropriate officers of the Department of Agriculture transmitted to the Treasury Department of the United States for collection and were in due time collected by the Treasury Department. The proceeds from such collection were then covered into the Treasury of the United States by covering warrants signed by the Secretary of the Treasury, countersigned by the Comptroller General and upon such covering warrants the Treasurer of the United States duly endorsed his receipt for the money so covered, and such money was commingled with the moneys of the United States and was subject to withdrawal only as appropriated by Congress. Under such circumstances it could not be true as plaintiffs and intervenors contend that the defendants as individuals are about to turn over the fund to so-called beneficiaries. Furthermore, since there is no fund in the possession of the defendants or under their control no trust can result. In the last paragraph of the opinion in Thompson et al. v. Deal et al., supra, it is said, "here the fund is admittedly under the control of appellees [defendants], admittedly also they are about to distribute it under the provisions of the Pool agreement to persons who legally have no valid claim to it." Assuredly the Court of Appeals correctly interpreted the complaint,

but I find that neither of the elements said to be admitted have any support whatever in the evidence.

█ The plaintiffs have abandoned their efforts and have asked to dismiss the case. That request was refused and the intervenors upon petition have been privileged to prosecute the action brought by the plaintiffs. The intervenors are permitted to prosecute only the case as stated by the plaintiffs and as analyzed by the Court of Appeals. Thompson v. Deal, supra. An intervenor may not introduce issues which are outside the scope of the issues in the main suit. The range of activity of an intervenor must be as extensive but no greater than that allowed the original parties·to the suit. The rule assumes that the interest which the intervenor is about to assert is already before the court; that there is an existing controversy so vital to the intervenor that he might be bound by a decision in the main suit. Intervention is permitted only when the intervenor and the parties to the original suit have a question of law or fact in common.

█ This action was brought to impress a trust upon a fund held in the United States Treasury and under the control of the individual defendants and for no other purpose. The intervenors are bound thereby and may not assert a claim sounding in tort. There is no fund in the Treasury of the United States subject to the control of the defendants as individuals. The fund may be dispursed only as appropriated by Congress and the United States has not been made a party to the suit.

If there is a plain ministerial duty on the part of Government officials to pay out any funds held in the Treasury, then such duty rests with the Secretary of the Treasury, the Comptroller General and the present Secretary of Agriculture, and they are not parties to this suit. It seems clear that no order that this court might now enter would enable the defendants to withdraw from the Treasury any money in the Pool appropriation accounts for distribution to the plaintiffs and the intervenors.

The action will be dismissed. Counsel for defendants will present for settlement suggested findings and a suitable form for the final order.