ORINOCO CO., Limited, et al. v. ORINOCO IRON CO. *

(Court of Appeals of District of Columbia. Submitted January 10, 1924. Decided March 3, 1924.)

No. 3989.

1. **United States** ⊜➔104—Complainant held to have a lien ex maleficio on trust fund paid into United States treasury under protocol.

Complainant, an iron company, whose interests in Venezuelan mines were confiscated, *held* to have a lien ex maleficio on the balance of an award paid, pursuant to the terms of a protocol between the United States and Venezuela, into the United States treasury as a trust fund, to be distributed to the beneficiaries thereof, following the filing of a memorial by complainant's grantor of the mining interest involved.

2. **Appearance** ⊜➔10—Answer held waiver of objection to jurisdiction.

Where defendant appeared specially and filed a motion to quash the service, but before any action was taken by the court on his motion he answered the petition, he waived his objection to the jurisdiction.

3. **Abatement and revival** ⊜➔3—General rule as to method of taking advantage of defective service.

Generally a party must appear specially to object to the jurisdiction on the ground of lack of proper service, and if the objection is overruled he may reserve an exception and then answer to the merits, renewing the objection in his answer.

4. **Process** ⊜➔155—Attack on service in answer held insufficient.

Where defendant made no attack on the service, except in its answer, its attack is insufficient.

5. **United States** ⊜➔104—Complainant entitled to enforce equitable right in fund paid into treasury under protocol.

Where complainant has an equitable right as against the other complainants in a fund paid, pursuant to the terms of a protocol with a foreign country, into the United States treasury as a trust fund for the beneficiaries thereof, under Act Feb. 27, 1896 (Comp. St. § 6668), complainant has a right to equitable relief, though the Secretary of State denied complainant's request to recognize its claim.

⊜➔For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Appeal dismissed 44 Sup. Ct. 461, 68 L. Ed. ——.

**6. United States ⊜─125—Suit involving trust funds in United States Treasury not against United States.**

Where a suit involves the question which claimant is entitled to trust funds held in the United States treasury, and the government claims no beneficial interest in the funds, the suit is not against the United States.

Smith, Acting Associate Justice, dissenting in part.

Appeal from the Supreme Court of the District of Columbia.

Suit by the Orinoco Iron Company against the Orinoco Company, Limited, John W. Le Crone, receiver of the Orinoco Company, Limited, Andrew W. Mellon. Secretary of the Treasury of the United States, and Frank White, Treasurer of the United States. Decree for complainant, and defendants appeal. Affirmed.

Arthur R. Colburn and R. R. McMahon, both of Washington, D. C., for appellants.

William R. Harr and Edward S. Duvall, both of Washington, D. C., for appellee.

Before SMYTH, Chief Justice, VAN ORSDEL, Associate Justice, and SMITH, Judge of the United States Court of Customs Appeals.

SMYTH, Chief Justice. This is an appeal from a decree of the Supreme Court of the District of Columbia, establishing the equitable claim of appellee to the sum of $56,250, in the treasury of the United States, and awarding an injunction against the Secretary of the Treasury and the Treasurer of the United States to prevent payment of the sum just mentioned to the Orinoco Company, Limited, or its receiver, two of the appellants, or to any one except the receiver appointed in the decree. The allegations of the bill, so far as we deem them pertinent, are substantially as follows:

In 1883 the government of the United States of Venezuela granted to one Fitzgerald certain territory in Venezuela for the term of 99 years, with the exclusive right to develop its resources. From Fitzgerald the concession found its way through mesne conveyances into the possession of the Orinoco Company, Limited, in 1896. This company, which we shall hereafter designate as the limited company, had no other assets than the concession. The next year the limited company, by an instrument in writing, granted to the Orinoco Iron Company, appellee, hereafter called the iron company, the exclusive right to mine, remove, and ship iron ore from the concession during its life, and covenanted to execute any further instruments that might be necessary to assure the iron company its rights under the grant. For the grant the last-named company was to pay to the grantor a stipulated royalty on the ore extracted. The limited company represented to the iron company that at a certain point in the concession there existed iron ore in abundance, and the iron company made contracts for the sale of 1,000,000 tons per annum at a price which would net to it a good profit. Later it was found that this representation was not correct, and the contracts had to be canceled. As the result of further negotiations between the limited company and the iron company, the latter was put in possession of an iron deposit called the Imataca Mine, a

part of the concession. The iron company, as soon as it obtained this, commenced active operations looking towards its development. A large quantity of ore was extracted and placed ready for shipment. Investigation revealed that the deposit was sufficiently large to warrant the iron company in contracting for the sale of 500,000 tons at an advantageous price.

About this time a revolution broke out in Venezuela, which was successful in overturning the existing government, and which drove the iron company out of possession of the property. Up to this time the iron company had spent something more than $175,000 under its contract with the limited company. It had all the money required for peaceful operation of the property, and was strongly underwritten by men of ample means. After it was forced out of possession by the revolutionists, it frequently called on the limited company to restore it to possession in accordance with its agreement, but the latter failed to do so. About this time the iron company complained to the State Department at Washington about the action of the Venezuelans, and until 1901 continued to make efforts to regain possession of the property.

The revolutionists, having succeeded, canceled the Fitzgerald concession in 1900, and thereby the iron company lost the $175,000 it had invested, about 500,000 tons of ore which it had stripped and placed in sight, and the sale of which would have given to it a net profit of about $1,000,000, and sustained other losses which it claimed would bring the total of its damage to about $5,000,000. About this time the limited company communicated to the iron company resolutions which it had adopted several months before, but after the revolutionists had dispossessed both companies, declaring the termination of the agreement under which the iron company had secured its right to develop the concession, between it and the iron company, on the assumed basis that the latter had failed to perform its part of the contract. The iron company, in answer, denied that it had failed in any particular, and asserted that it was ready to resume operations whenever allowed to do so. At this time nothing was owing from it to the limited company.

Shortly before this, but after the iron company had been driven out of possession, officers of the limited company and others organized the Orinoco Corporation, a party below, but not here, and transferred to it all the assets of the limited company. We shall designate this new organization as the corporation. In 1906 the corporation filed with the Secretary of State a memorial complaining of the acts of Venezuela, in which it represented that the iron company had abandoned its contract with the limited company after it was forcibly dispossessed, as we have stated, and that all the property of the iron company, including its title to the iron deposits, the improvements which it had placed upon the land, the ore mentioned, and a steamer belonging to it, had become the property of the memorialist, and it asked that it (the corporation) be placed in possession.

On the same day one Baxter, as attorney for the limited company and the Manoa Company, which appears in the chain of title between Fitzgerald and the limited company, filed a protest on behalf of his clients with the Secretary of State, claiming damages in their

behalf from Venezuela because of its action in taking possession of the concession, but making no mention of the iron company's rights or losses. In the protest Baxter made claim to the same property as that which the corporation, grantee of the limited company, averred in its memorial belonged to it. The Department of State of the United States, in presenting the claim to Venezuela, relied upon the efforts of the iron company to operate the concession as a bona fide attempt on the part of the limited company to comply with the terms of the concession. Proceedings were had which resulted in a protocol being entered into between the United States of Venezuela and the United States of America, whereby the former agreed to pay to the United States $385,000 as damages resulting from the action of the revolutionists in dispossessing the concessionaires, and from the subsequent action of the government of Venezuela in canceling the concession. The award was made on behalf of the limited company and certain of its predecessors in title.

By the terms of the protocol the United States of America, on behalf of the limited company and the others just referred to, waived in favor of Venezuela all claims which the limited company or the others had against Venezuela arising out of the cancellation of the concession or the seizure and destruction of the steamer belonging to the iron company. The amount of the award was paid into the treasury of the United States as a trust fund to be distributed to the beneficiaries thereof, the United States having no right, title, or beneficial interest therein.

The iron company further averred that the purpose of the limited company in attempting to terminate its contract, as heretofore stated, was that it might confiscate the rights and property of the iron company and defraud it, and that the protocol between the United States and Venezuela was intended to operate as a sale, release, and extinguishment of all the claims, rights, and interests of the iron company in the concession against Venezuela, and to relieve the latter of claims for damages by all persons asserting them under the concession, and it alleged that it had a beneficial interest in and prior lien upon the amount of the award for the sums expended by it as heretofore stated, with interest from the date of its ouster from the concession, and for the losses and damages it had suffered by reason of the ouster, and also that the Secretary of the Treasury and the Treasurer of the United States held the amount of the award lodged in the treasury as trustees for plaintiff, to be applied in satisfaction of its claim.

It prayed that a receiver be appointed to take charge of the fund and dispose of the same as the court on final hearing might determine; that the Secretary of the Treasury and the Treasurer be enjoined from cashing any warrant for any portion of the award, except to pay the same over to the receiver appointed by the court, and that on final hearing the injunction be made permanent. It also prayed for injunctive relief against the other defendants receiving from the Secretary of the Treasury or the Treasurer of the United States any money, warrant, or order on account of the award, and that an accounting of the plaintiff's losses and damages be had, and the award be applied to its payment.

The appellant Le Crone was appointed receiver of the limited company by a Minnesota state court in a suit brought by Baxter against the limited company for $75,000, fees claimed to be due him for services rendered the company. The limited company in its answer averred on information and belief that the iron company did not expend to exceed $75,000 upon the concession, and that at the time the concession was annulled by Venezuela the iron company was insolvent, denied the other allegations of the bill, and asserted that the iron company was indebted to it for royalties under the agreement.

In their answer the Secretary of the Treasury and the Treasurer admitted that the total amount of the award had been paid into the treasury of the United States, and that there was a balance of it in the sum of $56,250 remaining in the treasury, and they challenged the jurisdiction of the court to control their action in the premises.

The court found that the iron company was prevented from going ahead with the performance of its contract by the action of the government of Venezuela, by revolutions and other occurrences over which it had no control, that the making of the award embodied in the protocol was based on these facts, and that the limited company could not question them; also that the iron company was always ready, able, and willing to perform the contract, and was not in default, that it had spent a very much larger amount than the remainder of the award then in the Treasury, and that it was entitled to a decree for the remainder. A decree was entered for that amount, subject to an attorney's lien, which is of no importance here.

[1] The record makes it very clear that the iron company was ready, able, and anxious to proceed with the development of the property; that it had expended about $175,000 for that purpose; that it was prevented from proceeding with its work by the revolutionists at first, and then by the government of Venezuela; that there was no basis for the claim of the limited company that the iron company had failed to perform its contract in any respect, and that its declaration that the iron company had forfeited the contract was futile; that all its property, including 3,000 tons of ore ready for shipment, and the right to a very large deposit of ore containing several hundred thousand tons were confiscated by the Venezuelan government; that the limited company wrongfully represented to the Venezuelan government that the property and right belonged to it when taken, and that it was entitled to receive compensation therefor; that, relying upon this representation, Venezuela made compensation for the wrongs enumerated; and that in the $385,000 which Venezuela paid on that account was included the value fixed by the protocol upon the property and right just mentioned. In view of this we are convinced that the iron company has a lien ex maleficio upon the balance of the award in the treasury of the United States. It would be contrary to equity if the limited company should be permitted to enjoy the portion of the award which it secured by its wrongful representations. Mr. Pomeroy, in his work on Equity Jurisprudence (section 155), says:

"If one party obtains the legal title to property, not only by fraud or violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which legally

belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner."

This principle was approved by the Supreme Court of the United States in Angle v. Chicago, etc., Railway Co., 151 U. S. 1, 27, 14 Sup. Ct. 240, 38 L. Ed. 55. In that case it appeared that a railway company, designated as the Omaha Company, had conspired with the officials of the Portage Company to wrest certain land from the latter, that it might prevent it from completing a contract which it had entered into to construct a railroad as a consideration for the land, and that through its conspiracy the Omaha Company secured the land. Angle, the plaintiff in the action, had a contract with the Portage Company to construct a part of the railroad for that company. He entered upon the performance of his contract, and had completed a considerable part of it when, through the conspiracy mentioned, the land was taken from the Portage Company. This resulted in the inability of the company to proceed further, and hence in the breach of its contract with Angle. He sued the Portage Company for damages and secured a judgment. Execution having been returned nulla bona, he filed his bill to reach the land in the hands of the Omaha Company. The court, in sustaining his contention, said:

"Equity recognizes a right that that property should be applied in the payment for that work. The wrongdoing of the defendant, the Omaha Company, has wrested the title to this property from the Portage Company and transferred it to itself. It has become, therefore, a trustee ex maleficio in respect to the property."

To the same effect consult Pioneer Mining Co. v. Tyberg et al., 215 Fed. 501, 131 C. C. A. 549, L. R. A. 1915B, 442.

[2] The limited company and Le Crone, its receiver, were served by publication. Both contend that the court did not thereby obtain jurisdiction over them. Le Crone appeared specially and filed a motion to quash the service, but before any action was taken by the court upon his motion he answered the petition of the iron company. This constituted a waiver of his objection to the jurisdiction. In Barnes v. Western Union Tel. Co. (C. C.) 120 Fed. 550, defendant appeared specially and moved to dismiss because of defective service. Four days later, without having a decision on the motion, it filed a general demurrer and a full answer to the merits. It was held that it had waived the irregularity of process on which it predicated the motion to dismiss. For a discussion of the practice where a party desires to object to the jurisdiction of the court, see Eichelberger et al. v. Arlington Building, Inc., 52 App. D. C. 23, 280 Fed. 997; Church v. Church, 50 App. D. C. 239, 270 Fed. 361, 14 A. L. R. 769; Harkness v. Hyde, 98 U. S. 476, 479, 25 L. Ed. 237; and Merchants' Heat & Light Co. v. Clow & Sons, 204 U. S. 286, 27 Sup. Ct. 285, 51 L. Ed. 488.

[3] The general rule is, as shown by the foregoing authorities, that the party must appear specially and object to the jurisdiction. If his objection is overruled, he may reserve an exception, and then answer to the merits, renewing the objection in his answer. See, also, 7 R. C. L.

§ 78, p. 1044, and Arroyo Ditch, etc., Co. v. Superior Court, etc., 92 Cal. 47, 28 Pac. 54, 27 Am. St. Rep. 91.

[4] No attack was made upon the service by the limited company except in its answer to the merits. This, for the reason just given, was insufficient.

[5] It is provided by statute (29 Stat. 32 [Comp. St. § 6668]) that moneys received by the Secretary of State from foreign governments in trust for citizens of the United States shall be covered into the treasury, and that the Secretary of State shall determine the amounts due claimants, respectively, from the trust fund, and certify the same to the Secretary of the Treasury, who shall, upon the presentation of the certificates, pay the amounts so found to be due. The iron company requested the Secretary of State to recognize its claim and pay the amount thereof out of the fund received from Venezuela. This request was denied by the Secretary, on the ground that the claim was cognizable by the courts rather than by the Department of State, and that according to the uniform practice of the department parties holding claims like that of the iron company against a trust fund in the treasury were remitted to the courts for the enforcement of their rights.

Appellants, including the treasury officials, point to the statute, which says that the Secretary of the Treasury "shall, upon the presentation of the certificates of the Secretary of State, pay the amounts so found to be due," and urge that the courts have no power to direct the Secretary of the Treasury to pay to any person other than one holding a certificate of the Secretary of State. We think this is a misconception of the law. A question quite similar to the one thus presented was passed upon by this court in McAdoo v. Ormes, 47 App. D. C. 364. Our decision was taken to the Supreme Court of the United States on appeal and was there affirmed. In that case Congress, in an appropriation act, had directed the Secretary of the Treasury to pay to claimants in the act named the several sums appropriated therein.

Among those named was one Sanders. It will be noticed that the direction to the Secretary of the Treasury to pay to the claimant the amount appropriated was fully as direct and positive as the direction in the statute which we are considering. One Lockwood instituted a suit in the Supreme Court of this District to establish an equitable lien on the fund appropriated to Sanders, who was made a defendant, together with the Secretary of the Treasury and the Treasurer of the United States. There was a final decree adjudging that a certain sum was due from Sanders to Lockwood, appointing a receiver to collect from the Secretary of the Treasury the amount involved, and directing the Secretary to pay the same over to the receiver. The treasury officials challenged the jurisdiction of the court upon substantially the same grounds as those set forth in this case. In denying the soundness of their position the court said that the payment of the fund in question to the defendant Sanders was a ministerial duty, the performance of which could be compelled by mandamus. "But from this," continued the court, "it is a necessary consequence that one who has an equitable right in the fund as against Sanders may have relief against

the officials of the Treasury through a mandatory writ of injunction, or a receivership which is its equivalent, making Sanders a party so as to bind her and so that the decree may afford a proper acquittance to the Government. The practice of bringing suits in equity for this purpose is well established in the courts of the District." Houston v. Ormes, 252 U. S. 469, 473, 40 Sup. Ct. 369, 370 (64 L. Ed. 667), in which many cases are cited.

Here the iron company has an equitable right in the fund as against the limited company and Le Crone, and therefore has a right to relief, as Lockwood had, against the officials of the treasury, through the proceedings which have been taken. We do not think the matter is open to further discussion. The treasury officials rely for their position on Great Western Insurance Co. v. United States, 112 U. S. 193, 5 Sup. Ct. 99, 28 L. Ed. 687, but it affords them no support. That was an appeal from a decision of the Court of Claims, which dismissed the complainant's petition for want of jurisdiction. The Supreme Court affirmed this decision. We find nothing in it which bears upon the question now before us.

[6] The iron company is not seeking in this suit to recover anything from the United States. It is conceded, and properly so, that the money in question is held in the treasury as a trust fund. The government has no claim to it and it makes none. No matter what the outcome of the suit might be, the government would receive none of the fund. For this reason the suit is not against the United States, as argued by the appellants.

The decree must be, and it is, affirmed, with costs.

Affirmed.

SMITH, Acting Associate Justice (dissenting in so far as the opinion affirms the judgment of the lower court enjoining the Secretary of the Treasury). The moneys involved were paid by the government of Venezuela to the Secretary of State in satisfaction of claims arising out of the seizure and confiscation by Venezuela of the properties of certain corporations of the United States. The Act of February 27, 1896 (29 Stat. 32), provides that:

"Hereafter all moneys received by the Secretary of State from foreign governments and other sources, in trust for citizens of the United States or others, shall be deposited and covered into the treasury.

"*The Secretary of State shall determine the amounts due claimants, respectively, from each of such trust funds, and certify the same to the Secretary of the Treasury, who shall, upon the presentation of the certificates of the Secretary of State, pay the amounts so found to be due.*

"Each of the trust funds covered into the Treasury as aforesaid is hereby appropriated for the payment to the *ascertained beneficiaries thereof of the certificates herein provided for.*" (Italics not quoted.)

Under that act the Secretary of State determines the amounts due to claimants, and on his certificates to the Secretary of the Treasury, stating the amounts due to them, the Secretary of the Treasury is required to make payment to the beneficiaries ascertained by the Secretary of State. The payment by the Secretary of the Treasury to such beneficiaries is, it is true, a mere ministerial function; but it is a ministerial function which he must exercise under the statute in accordance with

the determination of the Secretary of State. The appropriation of the moneys necessary to make the payment is not a mere appropriation to pay moneys to persons or corporations named by Congress, but to persons and corporations decided by the Secretary of State to be entitled thereto.

In my opinion the Secretary of the Treasury cannot be enjoined from carrying out the determination which the Secretary of State was vested with final and exclusive power to make, especially as the Secretary of the Treasury was directed by the statute to make payment in accordance with that determination. If the Secretary of the Treasury may be enjoined from paying the moneys to the beneficiaries, it is not apparent why mandamus would not lie to compel payment to the plaintiff Indeed, if it be true that the Secretary of the Treasury can be enjoined from making the payments directed by the Secretary of State, then, as a corollary of that proposition, it would seem that the findings of the Secretary of State may be controlled and directed by the judicial department of the government.

As I see the case, neither the Secretary of State nor the Secretary of the Treasury is subject to the control of the courts in exercising the functions provided for in the Act of February 27, 1896. The court had jurisdiction, however, of the receiver and the beneficiaries in this case, and had the power to enjoin them from receiving the moneys, and the power to compel the transfer of the balance of the fund to those entitled to receive it.

I am of the opinion that the judgment of the court below should be reversed, in so far as it enjoins the Secretary of the Treasury from doing that which the determination of the Secretary of State and the act of Congress required him to do, and that the judgment should be affirmed in all other particulars.

Motion for allowance of an appeal to the Supreme Court of the United States granted April 2, 1924.

Appeal to the Supreme Court of the United States on behalf of Mellon, Secretary, and White, Treasurer, of the United States, granted April 21, 1924.