**STITZELL WELLER DISTILLERY v. WALLACE, Secretary of Agriculture, et al.**

No. 746.

District Court of the United States for the District of Columbia.

Jan. 22, 1940.

George R. Beneman and Norman J. Morrisson, both of Washington, D. C., for plaintiff.

Thurman Arnold, Asst. Atty. Gen., John S. L. Yost, Charles J. McCarthy, Sp. Assts. to Atty. Gen., and David A. Pine, U. S. Atty., and Harry L. Underwood, Asst. U. S. Atty., both of Washington, D. C., for defendants.

MORRIS, Justice.

The plaintiff brings this suit, on its own behalf and as representative of others similarly situated, in which the relief asked is that they be declared to be the owners of a fund now in the Treasury of the United States, aggregating $1,076,943.75, described in the complaint as the "parity payment fund;" that said fund be paid over to them; and that the defendants be enjoined from making payment or distribution of said fund to any other parties, except to such receiver as may be appointed by this Court to receive said fund. Asking is also made for a preliminary injunction and temporary receiver.

The defendants, individually, and as Secretary of Agriculture of the United States, Treasurer of the United States, and Secretary of the Treasury, respectively, filed motions to dismiss the action on grounds which may be summarized as follows: That the action is in effect one against the United States, and this Court is without jurisdiction because the United States has not consented to be sued herein; that the money, the recovery of which is sought, is in the Treasury of the United States and cannot be withdrawn in the absence of an appropriation, which has not been made, nor has this Court jurisdiction to appoint a receiver for said fund; that this is not a proper class action in that neither the payments nor the contract pursuant to which they were made are alleged to be due to any coercion or compulsion; that the defendants, and each of them, acted solely in their official capacity and were, therefore, agents of the United States, under authority of law, the validity of which is not challenged—hence, individually, they have no interest or control over the fund in question and are not proper parties in their individual capacities.

The fund came into being as a result of a marketing agreement, entered into between the Secretary of Agriculture and members of the Distilled Spirits Industry, of which the plaintiff is one, which agreement be-

came effective December 10, 1933, and was terminated April 18, 1934. This agreement was made pursuant to Section 8 (2), Title I, of the Agricultural Adjustment Act, approved May 12, 1933, 48 Stat. 31, 34.[1]

By the terms of the marketing agreement,[2] each contracting distiller agreed to pay for all cereal grain or products thereof, used by him in the manufacture of distilled spirits, not less than what is termed in the agreement the "fair exchange value."

Such "fair exchange value" for cereal grains is defined in the Agricultural Adjustment Act and represents a value which such products had during a base period considered to be normal. And it was agreed that the "fair exchange value" for products of cereal grains should be determined in accordance with conversion factors established by the Secretary of Agriculture. The agreement provided for the following method, by which such payment of not less

---

[1] "Sec. 8. In order to effectuate the declared policy, the Secretary of Agriculture shall have power—

"(1) To provide for reduction in the acreage or reduction in the production for market, or both, of any basic agricultural commodity, through agreements with producers or by other voluntary methods, and to provide for rental or benefit payments in connection therewith or upon that part of the production of any basic agricultural commodity required for domestic consumption, in such amounts as the Secretary deems fair and reasonable, to be paid out of any moneys available for such payments. * * *

"(2) To enter into marketing agreements with processors, associations of producers, and others engaged in the handling, in the current of interstate or foreign commerce of any agricultural commodity or product thereof, after due notice and opportunity for hearing to interested parties. The making of any such agreement shall not be held to be in violation of any of the antitrust laws of the United States, and any such agreement shall be deemed to be lawful: Provided, That no such agreement shall remain in force after the termination of this Act. * * *

"(3) To issue licenses permitting processors, associations of producers, and others to engage in the handling, in the current of interstate or foreign commerce, of any agricultural commodity or product thereof, or any competing commodity or product thereof. Such licenses shall be subject to such terms and conditions, not in conflict with existing Acts of Congress or regulations pursuant thereto, as may be necessary to eliminate unfair practices or charges that prevent or tend to prevent the effectuation of the declared policy and the restoration of normal economic conditions in the marketing of such commodities or products and the financing thereof.

"(4) * * *

"(5) * * *."

[2] "Marketing Agreement for the Distilled Spirits Industry, Article IV, Payment of Parity Price—

"Section 1. Each contracting distiller agrees to pay for all cereal grain or products thereof, used by him after the effective date of this Agreement, in the manufacture of distilled spirits, a total amount per unit not less than the fair exchange value therefor. The fair exchange value shall be promulgated hereunder by the Secretary from time to time. The fair exchange value for cereal grains shall be as defined in the Act; and the fair exchange value for products thereof shall be determined in accordance with conversion factors to be established by the Secretary.

"Sec. 2. For the purposes of this Agreement the Secretary shall promulgate hereunder from time to time a current average farm price for cereal grains and their products. The current average farm price for cereal grains shall be determined as provided in the Act; and a current average farm price for their products shall be determined in accordance with conversion factors to be established by the Secretary.

"Sec. 3. Whenever the sum of (1) the current average farm price for any cereal grain or product thereof used by contracting distillers, plus (2) the processing or other tax under the Act, if any, paid with respect thereto or with respect to a commodity from which processed or derived directly or indirectly, is less than the fair exchange value for such grain or product, the contracting distillers shall pay the amount of such difference (hereinafter known as the parity payment) into the Treasury of the United States or such other depository as may be designated by regulations of the Secretary.

"Sec. 4. Payments under this section shall be made at such times and in such manner, and shall be computed in accordance with such requirements as may be prescribed by regulations of the Secretary. Such amounts shall be utilized for rental or benefit payments or other disbursements under the Act made with respect to grain.

"Sec. 5. This Article shall not apply to barley malt."

than the "fair exchange value" should be accomplished: The Secretary of Agriculture should promulgate from time to time (1) a "current· average farm price," and, whenever the sum of (1) (the current average farm price) plus (2) the processing tax paid with respect to such cereal grain is less than the "fair exchange value," the contracting distiller shall pay the amount of such difference (known as the parity payment) into the Treasury of the United States or such other depository as may be designated by the Secretary of Agriculture. The agreement provides that such parity payments "shall be utilized for rental or benefit payments or other disbursements under the Act[3] made with respect · to grain."

It is alleged in the complaint, and therefore admitted by the motion to dismiss, that all parity payments made to the Secretary of Agriculture were deposited in a special account of the Treasury of the United States, designated as "8055, Collections, Distilled Spirits Industry, Parity Payments, Trust Fund," and are now held by the Treasurer subject to the direction and control of defendant Morgenthau in a special account in the Treasury of the United States, designated as a trust fund and entitled "Proceeds Distilled Spirits Industry, Parity Payments."

It is further alleged in the complaint that, although the parity payment fund was required to be used in making rental and benefit payments and other disbursements under the Act with respect to grain, and the Secretary of Agriculture was empowered to provide for such payments and disbursements in such amounts as he deemed fair and reasonable, the Secretary has made no determination either as to the amounts which he deems to be fair and reasonable payments and disbursements to be made out of the parity payment fund, or as to the conditions under which such payments were to be made. It is, therefore, claimed by the plaintiff that, in the absence of such determination, there is no beneficiary entitled to the fund. The plaintiff further asserts that the parity payment fund cannot now be used for the particular purpose specified in the marketing agreement, because (a) the Secretary of Agriculture does not now have legal authority to provide .for payments and disbursements in the manner provided in the Act, as amended, at the time the agreement was entered into; (b) the provision for the use of the fund for rental and benefit payments and other disbursements under the Act is void for indefiniteness and uncertainty in that it fails to establish any intelligible means of determining the persons to whom, and the amounts, time and conditions under which the parity payment· fund is to be disbursed; (c) all power to disburse the parity payment fund for the purposes specified in the marketing agreement ceased when the marketing agreement was terminated on April 18, 1934; (d) in the event power to disburse the parity payment fund did not cease on April 18, 1934, it was intended that such fund be used for the purposes specified in the marketing agreement within a reasonable time and not thereafter, and that such fund has now been held for more than four years, and a reasonable time for using said fund for the purposes stated has long since elapsed; and (e) the Secretary of Agriculture has abandoned all intention of using the parity payment fund for the purposes specified in the Act and in the marketing agreement.

The complaint avers that the marketing agreement should be construed to mean that, in the event said parity payment fund was not and could not be used for the particular purposes specified in the marketing agreement, said fund, or so much of it as remained, should be paid back by the Secretary of Agriculture to each contributing distiller in proportion to his contribution to said fund, and that, when the Secretary of Agriculture accepted the parity payments from the contributing distillers, he did so upon the condition that he would use the fund for the purposes specified in the marketing agreement, and upon further condition that, if he did not make use of such fund for such purpose, he would repay the money on demand to the distillers who paid it to him. It is insisted that such implied conditions and agreement now attach to the fund and, therefore, constitute a trust for the benefit of the plaintiff and other contributing distillers.

---

[3] "Marketing Agreement for the Distilled Spirits Industry, Article II, Definitions—

"Section 1. As used in this Agreement—

\* \* \* \* \* \*

"(b) The term "Act" means the Agricultural · Adjustment Act, approved May 12, 1933, as amended."

It is insisted by the plaintiff that the Congress, by the Permanent Appropriation Repeal Act of June 26, 1934,[4] has given legislative sanction for the payment of the fund in question according to the "terms of the trust;" that the "terms of the trust," under which the disbursement to this plaintiff and other contributing distillers has such sanction, are to be found in the marketing agreement, if construed as it is here contended it should be; and that hence there remains only a ministerial duty on the part of defendants to make such disbursement.

 For this Court to grant the relief asked for by the plaintiff, it is necessary that it be determined that the payments made by the plaintiff and other contributing distillers under the marketing agreement were to be used for specified purposes, and for the benefit of designated or ascertainable persons—in other words, that there exists an express trust with respect to said fund; that such fund has not been, within a reasonable time, or cannot be, used for such purposes, and for the benefit of such persons; and that it was the intention of the parties to the marketing agreement (and would have been so stated in said agreement had the parties contemplated the present situation) that any part of said fund not used for the purposes specified, and for the benefit of the persons indicated, should be returned to the plaintiff and other contributing distillers; and *further* that the failure to require such return to the plaintiff and other contributing distillers would result in the unjust enrichment of the payee, or such other inequity as could only be remedied by that relief. This, as I understand it, is the fundamental principle underlying the equitable power of declaring a resulting trust.

 Obviously, the equitable ownership of the fund in question cannot be settled unless all parties at interest are given an opportunity to be heard. So, at the outset, it must be determined whether or not the United States is a necessary party to these proceedings. If it is not, the Court may proceed to a consideration of the questions, upon the answer to which depends whether the relief asked for shall be granted or denied. If it is, the complaint must be dismissed, as the United States cannot be made a party to these proceedings without its consent, and such consent has not been given.

 If the fund here involved is one in which the United States has no proprietary or possessory rights, and it is only a question as to which of several private parties are now entitled to such fund, it may be said that the United States is not a necessary party. This is the principle decided by the United States Court of Appeals for the District of Columbia in Thompson v. Deal, 67 App.D.C. 327, 92 F.2d 478, which followed a decision of the same Court in Orinoco Co. v. Orinoco Iron Co., 54 App.D.C. 218, 296 F. 965, affirmed by the Supreme Court, sub nomine Mellon v. Orinoco Iron Co., 266 U.S. 121, 45 S.Ct. 53, 69 L.Ed. 199. In Thompson v. Deal, supra, the defendants, while officers of the United States, speaking through the Attorney General of the United States, asserted that, in so far as they handled the fund in controversy, they did so as representing, not the United States, but the individual cotton producers who deposited certificates in the pool, and that the proceeding was in reality "one between individuals who were parties to a purchase and sale transaction." [67 App.D.C. 327, 92 F.2d 482.] In the Orinoco case, the Supreme Court, speaking through Mr. Chief Justice Taft, upheld the jurisdiction of the Court in determining a controversy between private parties with respect to a fund paid into the Treasury by a foreign government where the Secretary of the State, having authority of law to direct the Secretary of the Treasury with respect to its payment, had "remitted to the courts" such private parties for a determination of their rights. That opinion quoted with approval the earlier case of Houston v. Ormes, 252 U.S. 469, at page 473, 40 S.Ct. 369, at page 370, 64 L.Ed. 667: "In the present case it is conceded, and properly conceded, that payment of the fund in question to the defendant Sanders is a ministerial duty, the performance of which could be compelled by a mandamus. But from this it is a necessary consequence that

---

4 "Permanent Appropriation Repeal Act of June 26, 1934, U.S.C.A. Title 31, Section 725r.

"* * * Provided, That donations, quasi-public and unearned moneys carried in official checking accounts * * *, administered by officers of the United States by virtue of their official capacity, shall be deposited * * * into the Treasury as trust funds and are hereby appropriated and made available for disbursement under the terms of the trust."

one who has an equitable right in the fund as against Sanders may have relief against the officials of the Treasury through a mandatory writ of injunction, or a receivership which is its equivalent, making Sanders a party so as to bind her and so that the decree may afford a proper acquittance to the government. The practice of bringing suits in equity for this purpose is well established in the courts of the District. Sanborn v. Maxwell, 18 App.D.C. 245; Roberts v. Consaul, 24 App.D.C. 551, 562; Jones v. Rutherford, 26 App.D.C. 114; Parish v. McGowan, 39 App.D.C. 184, s. c. on appeal, McGowan v. Parish, 237 U.S. 285, 295, 35 S.Ct. 543, 59 L.Ed. 955. Confined, as it necessarily must be, to cases where the officials of the government have only a ministerial duty to perform, and one in which the party complainant has a particular interest, the practice is a convenient one, well supported by both principle and precedent."

It is, however, well established that, where the United States has any interest, proprietary or possessory, in a fund in its possession, or in the possession of its officers, any proceeding to establish rights in such fund is in effect a suit against the United States, and in which the United States is a necessary party and, therefore, such proceeding cannot be maintained unless the United States has consented to be sued therein. In Haskins Bros. & Co. v. Morgenthau, 66 App.D.C. 178, 85 F.2d 677, 681, it is explicitly stated "* * * that the Secretary of the Treasury and the Treasurer are officers of the United States holding offices established by law; that their duties are to receive and preserve the public money and not to disburse it except conformably to law; that as officers of the United States they have no right or estate in the public money or any other money in the treasury, whether earmarked as a special fund or as part of the general fund of the United States; that they are in effect mandataries of a limited and defined commission;" and further "It is therefore of no moment whether the United States have the use of this money as they do the ordinary revenues of the government or whether the money represents a trust fund created by Congress and earmarked for a specific purpose. In either case it is money in the Treasury of the United States as to which the United States had and have the power of control and disposition." And in that case the earlier one of Richmond, F. & P. R. Co. v. McCarl, 61 App.D.C. 290, 62 F.2d

203, 206, was cited with approval on the point that the authority and duty of the United States with respect to a fund in the treasury does not depend alone upon a pecuniary interest therein. There it was held that moneys paid over to the Interstate Commerce Commission by certain railroads in order to establish a fund which might be used to help weaker lines were clearly moneys which the United States are charged with the duty of conserving, and, while not "public moneys in the sense in which the ordinary revenues of the government are public moneys," are "nevertheless public moneys in the sense that it is a fund which the United States control and which, through an instrumentality of the United States created by Congress, they disburse."

And, indeed, the Court went further in the Haskins case and cited with approval O'Connor v. Rhodes, 65 App.D.C. 21, 79 F. 2d 146, to the effect "that funds in the hands of the Comptroller of the Currency belonging to insolvent national banks, and redeposited by him in other banks for safe-keeping, were federal funds to which the government of the United States occupied the relation of trustee." With respect to the fund involved in the Haskins case, the Court said: "* *. * and, though designated by the Congress as a special fund for the benefit of the Philippine Treasury, it is while in the treasury money as to which the United States, and not appellees, are trustees. And in this view, the conclusion is inevitable that the United States are essential parties in any litigation involving the fund and, they not having consented to be sued, the suit cannot be maintained." And, on the question as to the joinder in those proceedings of officers and agents of the United States in their individual capacity, it is said in the Haskins case: "In the instant case the acts and proceedings which are here sought to be controlled are those which are implied in the inherent duties and functions of the offices of the appellees. Indeed, they are their ordinary duties. Here there is nothing extraneous to the offices; nothing is required of the individual. The things to be done are required entirely of the functionary and not at all of the individual. And so we are brought back to the rule that, if the suit is against the officer in his official character and the claim made upon him, likewise in his official character, the United States are indispensable parties."

It is claimed by the plaintiff here that the marketing agreement was executed by the Secretary of Agriculture in his individual capacity, and not as an officer of the United States. Clearly, it was an act of Congress which authorized the Secretary of Agriculture to enter into the marketing agreement in question and, "through agreement with producers * * * to provide for rental or benefit payments," in connection with which, under the terms of the marketing agreement, the parity payment fund was to be used. And, if a proper understanding of the marketing agreement is to be had, it must be viewed "as a part of a general plan." Yarnell v. Hillsborough Packing Co., 5 Cir., 70 F.2d 435, 438. The Court takes judicial notice of the license for the Distilled Spirits Industry, issued by the Secretary of Agriculture on the same day on which the Secretary of Agriculture executed the marketing agreement for the Distilled Spirits Industry, both of which were published together as a public document by the Department of Agriculture, and captioned "Marketing Agreement Series—Agreement No. 27. License Series—License No. 21." It will be noted that this license is applicable to all persons engaged in the production of distilled spirits in the United States, [5] and that, unless such distiller shall secure a special permit, issued only to one who subscribes to the marketing agreement, he may not manufacture distilled spirits, except from *cereal grains or their products*. [6] The only way, therefore, in which a distiller could make use of sugar or molasses, a much cheaper product than cereal grain, for beverage distilling purposes would be to secure a special permit under Article V of the Marketing Agreement, and it was a condition of such permit that the permittee shall pay an amount on the commodity used equal to the parity payment which he would pay on an equal amount of cereal grain, [7] which pay-

---

[5] "License for the Distilled Spirits Industry, Article I, Section 1.

\* \*. \* \* \* \*

"(f) The term 'distiller' means any person who is engaged in the production of distilled spirits in the United States."

[6] "License for the Distilled Spirits Industry, Article III, Use of Cereal Grains.

"Section 1. Except as provided by special permit issued pursuant to Article V of the Marketing Agreement for the Distilled Spirits Industry, each distiller shall manufacture distilled spirits (including any mash, wort, or wash used therefor), after the effective date of this License, exclusively from cereal grains or their products; and market for beverage use only such distilled spirits now held or hereafter acquired by him as are manufactured from cereal grains or their products.

"Sec. 2. This Article shall not apply to rum or brandy or brandy spirits for wine fortification."

[7] "Marketing Agreement For The Distilled Spirits Industry, Article V, Special Permits.

"Section 1. Upon application to the Secretary, made in accordance with such regulations as the Secretary shall prescribe, the Secretary is authorized, from time to time, to issue to contracting distillers special permits for the manufacture of designated amounts of ethyl alcohol to be used for the manufacture of gin or the rectification of distilled spirits and to be manufactured from commodities other than cereal grain or products thereof. The aggregate amount of ethyl alcohol so authorized for manufacture during any period shall (if applications in sufficient amount are made) be not less than ten per centum of the amount of ethyl alcohol required for manufacture of gin or the rectification of distilled spirits during such period. The amount so required shall be estimated by the Secretary from available data of the Government or the Code Authority. Notwithstanding the foregoing limitation the Secretary may issue additional special permits to contracting distillers for the manufacture during such period of distilled spirits from commodities other than cereal grains and their products, if during such period there will not, in the judgment of the Secretary, be available an adequate supply of distilled spirits manufactured from cereal grains or products thereof. The Secretary shall specify in any such permit the commodity, source, and quantity permitted to be so used, the period during which the commodity may be so purchased and used, and such other terms and conditions as may be necessary. Such additional special permits shall not be issued whenever, in the judgment of the Secretary, the issuance of such permits will prevent or tend to prevent the effectuation of the declared policy of the Act.

"Sec. 2. It shall be a condition of any such permit that the permittee shall pay an amount, per unit of the commodity used under permit, equal to the parity payment, if any, then in effect per equivalent unit of the cereal grain or product thereof, if any, normally used, or available for use by the permittee. In addition, if no processing or other tax under the Act is in effect with respect to the-

---

ments became part of the parity payment fund. What obligations and benefits accrued to the plaintiff and other contributing distillers under the marketing agreement is not the question here sought to be answered. It is apparent, however, that these obligations and benefits cannot be disassociated from the acts of the Secretary of Agriculture in his official capacity, authorized and performed pursuant to Act of Congress. The inference is inescapable that distillers who made use of cereal grain, and who could afford, by reason of the sales price of their product, to pay more for such grain than could be paid by producers of other grain products, desired not only to accomplish a benefit to the growers of grain, but to protect themselves from ruinous competition by the distillers who made use of materials other than cereal grain. The marketing agreement, standing alone and without the license, would have fallen short of this result. The marketing agreements, themselves, and the licenses were, indeed, ratified and approved by Act of Congress,[8] and, in this connection, it should be noted that the plaintiff does not challenge the validity of the legislation, nor the marketing agreement and license pursuant thereto; nor is it claimed that the contract or the payments in question were the result of any coercion or compulsion.

It is further insisted by the plaintiff that, under the terms of the marketing agreement, the Secretary of Agriculture could have designated a depository for the parity payment fund other than the Treasury of the United States. The fact remains that he did not do so, and, if he had, it would seem from O'Connor v. Rhodes, supra, that the interest of the United States with respect thereto would not be different.

Assuming, but not deciding, that the marketing agreement created a trust, it seems to me clear that, in the circumstances shown by the complaint, the United States, and not the Secretary of Agriculture as an individual, is the trustee. It follows then that the questions involved in these proceedings cannot be determined in the absence of the United States as a party. The defendants herein, as individuals, clearly have no interest in the fund sought to be recovered. The only relations they had with the transactions or the fund here involved were in their official capacities and not beyond the authority vested in them by legislative direction. Any interest in said fund acquired by them, or either of them, was acquired in their official capacities, and hence was and is an interest of the United States. Unless, then, the United States is a party in these proceedings, there would be no party having an interest, or representing those who may be beneficially interested, adversary to those parties who seek the return of a fund, the voluntary payments into which were made under an agreement that contained no provision for such return. Without the presence of the United States as a party in these proceedings, the Court could not determine whether unjust enrichment would result by withholding the equitable relief here sought, or by exercising it in directing a return of this fund to those who, by inescapable inferences from the terms of the marketing agreement, have recouped from the consumers of their products in the price thereof the amount of the payments which they have made.

---

commodity used under permit, the amount to be paid shall be increased by the amount of the processing or other tax under the Act, if any, then in effect per equivalent unit of such cereal grain or product thereof.

"Sec. 3. Payments under this Article shall be paid into the Treasury of the United States or such other depository as the Secretary may by regulation provide; and shall be made at such times and in such manner; and shall be computed in accordance with such requirements, as may be prescribed by regulations of the Secretary. Such payments shall be utilized in the same manner as payments under Article IV.

"Sec. 4. The Secretary shall by regulation establish such conversion factors as may be necessary for the purposes of this Article."

[8] Section 4 of Public No. 137, 75th Congress, approved June 3, 1937, 50 Stat. 246, 249, 7 U.S.C.A. § 672, provides: "Nothing in this Act [chapter] shall be construed as invalidating any marketing agreement, license, or order, or any regulation relating to, or any provision of, or any act of the Secretary of Agriculture in connection with, any such agreement, license, or order which has been executed, issued, approved, or done under the Agricultural Adjustment Act, or any amendment thereof [sections 601 to 624 of this title], but *such marketing agreements, licenses,* orders, regulations, provisions, and acts are hereby *expressly* ratified, legalized, and confirmed." (Italics supplied.)

Of course, it lies within the competency of the Congress to direct the payment of this parity payment fund to the plaintiff and other contributing distillers. The plaintiff insists that this has been done, but with this contention I cannot agree. The Permanent Appropriation Repeal Act of June 26, 1934, supra, clearly contemplates a trust fund held under such "terms of the trust" as afford clear direction for the disbursement of such fund. The instant proceedings are brought for the purpose of supplying directions for the return of the fund, which are not contained in the marketing agreement. In the absence of such "terms of the trust," which show the beneficial ownership of the fund, I do not understand the statute to authorize such disbursement. In this connection, it is significant that succeeding sections of that statute specifically enumerate funds of much less public concern and amount than the one here in controversy, which was held in the Treasury at the time of the passage of that legislation. If it is the will of the legislative branch of the Government that this fund be returned to the plaintiff and other contributing distillers, a clear expression of such intent will completely accomplish that result. If the Congress considers the claims of the plaintiff and other contributing distillers to be such as should be judicially determined, presumably it will give the consent which is necessary for the United States to be made a party in appropriate proceedings.

For the reasons stated, I am of the opinion that the United States is an essential party to these proceedings; that no determination of the questions involved can otherwise be made; and that, as the United States has not given its consent to be sued in these proceedings, the complaint must be dismissed.