**WESTERN URN MANUFACTURING COMPANY et al., Appellants,**

**v.**

**AMERICAN PIPE AND STEEL CORPORATION, Appellee.**

**No. 16600.**

United States Court of Appeals District of Columbia Circuit.

Argued March 6, 1962.

Decided April 12, 1962.

Petition for Rehearing Denied Oct. 11, 1962.

---

Mr. John H. MacVey, Washington, D. C., for appellants.

Mr. Albert H. Greene, Washington, D. C., for appellee.

Before WILBUR K. MILLER, Chief Judge, and DANAHER and BURGER, Circuit Judges.

DANAHER, Circuit Judge.

When an earlier phase of this litigation was before us, we pointed out that the District Court had misconceived the theory upon which its jurisdiction had been invoked. We remanded, noting that if the named garnishee Greene "shall be found to have been possessed of assets, funds or credits, of the appellee at the time the writ was served," the court should reinstate the complaint "subject to such further proceedings as the parties may feel advised to pursue." At a hearing after remand, the trial judge denied appellants' motion for leave to file an amended complaint. It was also found, without examination of Greene as a witness and without his sworn answers to the interrogatories which had been served on him, that Greene "was not indebted to, and was not otherwise possessed of assets of, the [appellee] at the time when the said writ of attachment before judgment was personally served in the District of Columbia upon the said garnishee, Albert H. Greene."

In reversing, we had ruled only in light of the facts discussed in our opinion.[1] After remand a very different situation was disclosed, and supplemental facts as presently discernible will hereinafter be developed.

Appellants noticed for rehearing on April 17, 1961, their motion for leave to file a proposed amended complaint and to summon as additional parties, the members of Greene's law firm. To establish a foundation therefor, appellants had procured an order for oral examination[2]

1. Western Urn Mfg. Co. v. American Pipe & Steel Corp., 109 U.S.App.D.C. 145, 284 F.2d 279 (1960).

2. D.C.Code, § 16–303 (1951) provides in part:
"In addition to the answers to written interrogatories required of him, the garnishee may, on motion, be required to appear in court and be examined orally under oath touching any property or credits of the defendant in his hands."

We long since noted that such an oral examination "may be necessary for the information of the creditor before he is

of representatives of the National Savings and Trust Company and United States Treasury officials. Appellants were entitled, after oral examination, to file a traverse and to raise an issue with respect to matter developed at the oral examination.[3]

The Bank on October 31, 1959 had been served as garnishee in the original action. At that time the Bank had submitted sworn answers to the interrogatories served upon it, one of which read:

> "Have you participated in the negotiation of a U. S. Treasury check in the approximate amount of $209,-243.03 payable to American Pipe and Steel Corporation, and paid to or held for the account of Albert H. Greene, attorney in fact for said Corporation, any portion thereof?" A. "Yes."

Greene had not answered the interrogatories served on him at 4:15 P.M., October 16, 1959, with the writ of attachment before judgment. Had he done so, he might then have raised his defenses to the writ. Of course, the appellants would not have been bound by his answers even if he had denied possession of funds or credits of the appellee.[4] Appellants would have been permitted by traverse to put in issue the factors upon which Greene might have relied. Our Code expressly so provides.[5]

To demonstrate the turn the case had taken, appellants first called a witness from the United States Treasury. Through his testimony it was established that on October 16, 1959 the Government had issued its check for $209,243.03 payable to American Pipe & Steel Corporation, care of Albert H. Greene, 1000 Connecticut Avenue, N.W., Washington 6, D. C. The Government's records showed that the check had been received on October 16, 1959 by Albert H. Greene whose signature preceded the name of his firm. The trial judge asked whether Greene had not been designated on the exhibit "as Attorney at Law or Attorney in Fact?" "No, sir, I don't believe so," replied the witness. The exhibit before us reveals that the Government's payment was on behalf of American Pipe & Steel Corporation "c/o Albert H. Greene." The witness further answered that according to the exhibit Greene had "[p]hysically received the check."

A Bank official as the next witness identified a series of exhibits, now of record for the first time. One was a certified copy of a resolution dated October 9, 1959 of the board of directors of American Pipe & Steel Corporation adopted *September 25, 1959* which purported to authorize and empower one Jack Lane as president of the Corporation to sign and endorse over *to Greene's law firm* the Treasury Department's check so that the check "may be deposited to the account of" the firm, and so that "they may then issue to the Corporation their check for the difference between the amount of the Treasury Department check and the legal fee to be paid" to the law firm "as full payment for their counsel in connection with the $300,000 government claim settlement." The next exhibit was the Bank's check dated October 16, 1959 payable to the order of American Pipe & Steel Corporation in the amount of $159,243.03 drawn on Security-First National Bank of Los Angeles, California. This check bore the endorsement "Pay to the order of Jack Lane," then the name of the Corporation "By" [signature illegible]

---

able to decide whether he should traverse the answer of the garnishee." *Fidelity Savings Co. v. Security Savings & Commercial Bank,* 55 App.D.C. 180, 181, 3 F.2d 351, 352 (1925).

3. We have held that a traverse of the answer is not a condition precedent to the exercise of the right to require oral examination. Flynn v. Potomac Electric Power Co., 60 App.D.C. 82, 47 F.2d 978 (1931).

4. Fidelity Savings Co. v. Security Savings & Commercial Bank, supra note 2.

5. D.C.Code, § 16-317 (1951); Young v. Nicholson, 70 App.D.C. 351, 352, 107 F. 2d 177, 178 (1939); Ourisman Chevrolet v. Pohanka Service, 138 A.2d 668 (D.C. Mun.App.1958).

and the further typed endorsement "Jack Lane—President." Exhibit 4 was an original credit memorandum identifying the appellee's account and the amount of the check which, the witness explained, "sets up our obligation on our general ledger for the check which had been drawn or issued on the Security-First National Bank of Los Angeles."

Exhibit 5 was identified as "the microfilm of our deposit of October 16, 1959 in the amount of $50,000 which amount was credited" to Greene's law firm.[6]

The Bank's witness testified to familiarity with the transaction and the negotiation of the check. He had signed the check drawn on the California bank. With respect to the negotiation of the United States Treasury check, the Bank's witness testified that "[A]pproximately at 1:00 or 1:30, Mr. Greene brought a gentleman in, Mr. Lane, who was president of the American Pipe & Steel Corporation and requested that we negotiate this check by issuing our check on a California bank minus the fee which was due his company." [7]

Thereupon the Bank's check was accordingly issued as requested for $159,243.03 and the account of Mr. Greene's firm at the same time was credited by the Bank with the amount of $50,000. The two sums total the amount stated in the United States Treasury check as payable to American Pipe & Steel Corporation. The corporate resolution was "our authorization for negotiating the check." The Bank's witness had learned prior to October 16, 1959 of the impending negotiations. "I had understood that Mr. Greene would be bringing a client in with the request that we negotiate a check for him but I had no other information about it."

"Q. But you knew that before October 16?

"A. That is right.

*  *  *  *  *  *

"Q. And the transaction which you have just described was done in accordance with that prior knowledge?

"A. That is right."

Appellants' counsel brought out from the Bank's witness that the Treasury check had not been deposited. "We cashed the check for the American Pipe & Steel Corporation. Our records will show that we handled that as a cash transaction, cashing the check, in effect, for the corporation and depositing $50,000 in cash to the law firm."

Appellants challenge Greene's claim and the trial court's finding as to the legal significance of the record as established, insisting that the $50,000 had not become Greene's property or that of his firm, free from appellants' claim. On that theory jurisdiction could be established by the garnishment. They argue that by arrangements made in advance with Bank officials, Greene and the appellee through Lane, had procured the Bank to cash the Treasury check, to pay Greene and his firm, and even to set up on the Bank's books a credit in favor of the appellee against which the Bank issued its Treasury check on its California correspondent, and thus sought to hinder and delay the appellants despite various provisions of the D.C.Code.[8] Appellants argue that the $50,000 received by Greene was chargeable in their favor.

6. Also introduced was the signature card of the firm which included the signature of Albert H. Greene. Appellants point to the printed agreement on the signature card "that deposits of checks on other banks, though credited, cannot be drawn against until said checks have been collected *  *  *  *" Whatever weight may be attached to that agreement for other purposes, it is clear that a bank may waive the limitation. Lowrance Motor Company v. First National Bank, 238 F.2d 625, 628 (5 Cir. 1956); South End Bank & Trust Co. v. Nasin, 147 Conn. 215, 219, 220, 158 A.2d 591, 593 (1960).

7. The "fee" was purportedly explained, not through testimony from Greene, but in the course of colloquy. Greene did not take the stand subject to cross-examination as to appellants' claims and Greene's explanation with reference thereto.

8. §§ 12–401, 16–301 (1951).

They insist that he and his firm and the appellee were not entitled to conclude appellants in derogation of appellants' rights derived from the circumstances as alleged in the proposed amended complaint.[9]

Turning to the latter pleading we examine the allegations upon which rest the appellants' contentions. Appellants would undertake to show that in 1957 Greene's law firm had filed three petitions in the Court of Claims on behalf of the appellee. The following year, the same firm in the name of the appellee as prime contractor but *for use of* the Western Urn Manufacturing Company as subcontractor, had filed a fourth petition in that court. In 1959 following conferences with appellants' attorneys, Greene had filed an amended petition in the Court of Claims in case No. 272–58. Thereafter Greene submitted to the Attorney General an offer to settle all four claims for a total of approximately $500,000. It was alleged that lacking complete agreement on how the business should be handled, Greene suggested that discussions between him and counsel for the appellants be postponed until the respective corporate *parties* had negotiated terms.

On or about June 4, 1959, the respective corporate parties actually concluded an agreement which called for an extension of the time within which appellee was to pay its note for $17,481.17 with interest, then held by the appellants.[10] Also, it was alleged, the appellee was to pay the appellants the sum of $25,866.89 representing appellants' claim, reduced in the same proportion as were the claims of the appellee, in order to effectuate with the Government an effective settlement in the total amount of $300,000. Thereafter, on June 5, 1959, counsel for the appellants conferred with Greene to arrange participation in the settlement negotiations then being conducted by Greene with the Department of Justice. Under the rules of the Court of Claims, it was alleged, appellants as a result of the written agreement of June 4, 1959, then had the legal right to intervene as interested parties in the Court of Claims. Notwithstanding, and because of Greene's objection, appellants' counsel thereupon agreed not to participate in the settlement negotiations "in consideration of a promise made by the said Greene acting as aforesaid at said conference to keep [appellants' counsel] informed concerning the course and results of the said settlement negotiations." Greene told counsel to submit a formal demand for the payment of the appellants' claim after Congress had appropriated an amount sufficient to settle the pending claims.

A stipulation of settlement dated September 8, 1959, was entered into between Greene and the Department of Justice. That stipulation included a covenant by appellee "not to sue on its own or its subcontractor's behalf" and the further clause that the appellee "will at no time hereafter institute suit with respect to the claims set forth in the petition in case No. 272–58 either on its own behalf or on behalf of its subcontractor Western Urn Manufacturing Company." [11]

9. The trial judge observed at the hearing April 17, 1961, that he had not seen the proposed amended complaint and that the matter was not before him.

10. Payment of the note indebtedness was made at some time subsequent to October 16, 1959, it now appears.

11. Whether or not the Government would have issued its separate check in payment of Western Urn's claim had its counsel participated in the settlement, we do not know. It is clear, however, that appellants, before the Treasury check was issued, could have sought to impress an equitable lien on the appropriated Government funds, subject, of course, to personal service upon the non-resident appellee. Orinoco Co. v. Orinoco Iron Co., 54 App.D.C. 218, 296 F. 965, appeal dismissed, 265 U.S. 598, 44 S.Ct. 461, 68 L.Ed. 1199 (1924); Houston v. Ormes, 252 U.S. 469, 40 S.Ct. 369, 64 L.Ed. 667 (1920); and see D.C.Code, § 16–306 (1951).

Appellants' counsel on September 18, 1959, here made demand . upon Greene, and shortly thereafter their California counsel there made demand upon the appellee, for payment of their claim and of the amounts due on their note. Receiving no reply from the appellee and no information from Greene, and lacking arrangements for payment of appellants' claim, appellants' counsel "by their own initiative" learned on October 16, 1959 that the Treasury check was to be delivered that day to the defendant Greene. Only then was suit instituted in the District Court which led to the issuance of the writ of attachment before judgment.

We have set forth only the highlights giving rise to the appellants' charge that the manner of negotiation of the Government's check about 1:15 P.M. on October 16, 1959 was undertaken "with the intent to hinder and delay the payment of the just claim" of the appellants under the agreement of June 4, 1959. Greene would say that when he was served that day at 4:15 P.M., he no longer had in his possession any assets or credits of the *appellee*, for the money had become his property or that of his firm.

Such was the background against which appellants asked that the court declare void [12] *ab initio* and set aside the conveyance of $50,000 by the appellee to Greene and the members of his firm, and thereupon that the court find that Greene "individually had possession of a portion of the assets" of the appellee at all times on October 16, 1959, after delivery of the Treasury check and at the time of the service of the writ of garnishment on Greene at 4:15 P.M. on that day. Appellants also asked that the court direct that the bank account of the individual members of Greene's law firm with the National Savings and Trust Company be subject to the same writ of attachment.

It is clear as shown by this record that as a result of pre-arrangements between the Bank on the one hand and the appellee and Greene on the other, the United States Treasury check was not deposited in the usual manner for clearance.[13] We cannot know whether or not appellants are able by proof to sustain their further allegations.

Various possible bases for the assertion of rights by the appellants emerge from the welter. For example, it may be made to appear that appellants' counsel could have intervened in the action brought in behalf of the appellants in the Court of Claims, but were dissuaded from doing so because of reliance upon some independent agreement by and with Greene that appellants' rights would be protected, but unlawfully were not. Again, perhaps the proof will disclose that funds paid by the Government on the account of the appellee "c/o Albert H. Greene" had become subject to a constructive trust.[14] Perhaps it may be shown that appellants had otherwise changed their position in reliance upon representations by Greene, who in breach of a duty to protect the interests of the appellants, had elected only to look out for himself and his client, the appellee.[15]

The trial judge in narrowly interpreting our mandate, failed to realize that when we reversed the earlier order of dismissal, we were passing only upon the record then before us. We could not

---

12. D.C.Code, § 12–401 (1951) provides, in effect, that every conveyance "with the intent to hinder, delay, or defraud creditors or other persons having just claims or demands of their lawful suits, damages, or demands, shall be void as against the persons so hindered, delayed, or defrauded * * *." And see D.C.Code, § 16–301 (1951). We may note that appellants specifically disclaim reliance upon fraud.

13. And apparently not in the manner set forth in the appellee's resolution of authorization for collection by its president, Lane; see text, supra, and note 6 supra.

14. Cf. Osin v. Johnson, 100 U.S.App.D.C. 230, 233, 243 F.2d 653, 656 (1957).

15. Anglo-American Savings & Loan Ass'n v. Campbell, 13 App.D.C. 581, 602, 603, 606 (1898).

have done otherwise,[16] but we should have been more explicit. We could not then have foreclosed the appellants from pursuing the rights accorded to them by our Code. We surely did not intend that our mandate be taken to prevent the District Court in the exercise of its sound discretion "from allowing plaintiff, were adequate showing made, to file additional pleadings, vary or expand the issues and take other proceedings to enforce the accounting sought by his bills of complaint."[17] Rather, our opinion was simply a statement of the reasons on which reversal was ordered.[18]

■■ We again reverse the order of the District Court, and we do so without adjudication of the rights of the parties. We say only that after oral examination of the garnishees,[19] and especially in light of the results of the examination of the Bank's witness, appellants were entitled to amend their complaint to show a basis for the claimed jurisdiction. Appellants thereupon would be bound to prove that $50,000 of the Government's money payable to the appellee had come into the hands of Greene. If they could further show that such funds had become chargeable in favor of the appellants as a result of the course of dealings as alleged, the monies would still be funds of the appellee subject to attachment. On such a showing, the purported conveyance to Greene or his firm might be set aside, and the funds in the hands of Greene or his firm would be amenable to the writ. Accordingly, as previously noted, the court would not lack jurisdiction.[20]

The finding of "no indebtedness" was premature. The trial judge erred in denying appellants leave to file their proposed amended complaint and in dismissing the action.

Reversed and remanded.

16. In re Sanford Fork & Tool Co., 160 U.S. 247, 258, 16 S.Ct. 291, 40 L.Ed. 414 (1895).

17. Rogers v. Hill, 289 U.S. 582, 588, 53 S.Ct. 731, 77 L.Ed. 1385 (1933).

18. Id. at 587, 53 S.Ct. at 733.

19. Young v. Nicholson, supra note 5.

20. Of course we express no opinion as to how the ultimate issue is to be decided.